AUSTIN RANCH ENTERPRISES, INC., d/b/a Austin Ranch, Appellant,

v.

Gloria C. WELLS, Appellee.

No. 2–88–017–CV.

Court of Appeals of Texas, Fort Worth.

Sept. 29, 1988.

Daniel R. Barrett, Tim G. Sralla, Reynolds Shannon Miller Blinn White & Cook, Fort Worth, for appellant.

Bryan S. Arnold, Robertson, Boyle & Arnold, P.C., Grand Prairie, for appellee.

Before FENDER, C.J., and BURDOCK and LATTIMORE, JJ.

## OPINION

LATTIMORE, Justice.

This is an appeal arising from a suit for personal injuries allegedly suffered by appellee after eating at appellant's facility. The court, based on the jury's answers to special issues, granted judgment against appellant for actual and exemplary damages, and awarded attorney's fees to appellee.

Appellant raises eight points of error alleging: error in granting exemplary damages; improper undesignated testimony; and improper granting of attorney's fees and medical expenses.

The judgment of the trial court is affirmed as reformed if remittitur is filed. If not, the judgment of the trial court will be reversed and remanded.

By its first four points of error, appellant contends exemplary damages were improperly granted because there is no or insufficient evidence of gross negligence or the alleged gross negligence was a proximate cause of the occurrence in question.

In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *See Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex.1985); *International Armament Corp. v. King*, 686 S.W.2d 595, 597 (Tex. 1985); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In re King's Estate*, 244 S.W.2d at 661–62.

■ A "no evidence" point of error must and may only be sustained when the record discloses one of the following: 1) a complete absence of evidence of a vital fact; 2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or 4) the evidence establishes conclusively the opposite of a vital fact. *Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278, 288 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEXAS L.REV. 361 (1960).

■ An assertion that the evidence is "insufficient" to support a finding of fact can mean the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming the finding should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all of the evidence in the case in making this determination. *See id.* Findings of fact are the exclusive province of the jury and/or trial court. *Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744–45 (Tex.1986). A court of appeals cannot make findings of fact, it can only "unfind" facts. *Id.* If the court of appeals sustains a point of error finding the evidence factually insufficient, it *must* reverse the judgment of the trial court and *remand* for new trial. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401–02 (Tex.1981). This court has no jurisdiction to render judgment based upon an insufficient evidence point. *See B.J. Valve & Fitting Co. v. Elliott Valve Repair Co.*, 679 S.W.2d 1 (Tex.1984).

The appellee, Gloria Wells, testified she attended an annual meeting of her company in April of 1984, which was held at the DFW Hilton. Approximately 200 people were in attendance. All meals but one were arranged by her organization. On April 3, 1984, Wells ate at a scheduled dinner at the Austin Ranch; it was a buffet barbecue meal. She ate ribs, roast beef, beans and had tonic water with a squeeze of lime. Wells began feeling slightly unwell prior to dinner on April 4th. Between dinner at the Austin Ranch and dinner on April 4th, Wells ate five other meals, all at the Hilton. On the morning of the fifth, she experienced diarrhea and cramps. Wells changed her travel plans due to feeling ill and returned home. When she arrived home she was in pain, now suffering additionally from severe diarrhea, pain from cramping, nausea, and was throwing up. On April 8th, Wells went to the emergency room at St. Vincent's Hospital. She stayed in the hospital seven days, and at home an additional seven days.

Wells spoke to Connie Elmore at her company to tell her that Wells had been ill. Others had also reported being ill after the convention. At the time of trial, Wells was still experiencing some problems which she believes her doctor cannot cure. Wells admitted on cross examination that she had not taken the Bentyl prescribed for her spastic colon for a couple of months.

The deposition of Dr. Gustafson, investigator of the case, was read to the jury. He is president of Infection Control and Pre-

vention Analysts, and had previously investigated probably ten or twenty food-borne outbreaks which were similar to the present case. At the time of Wells' problems, Gustafson was Director of Infectious Diseases at the Texas Department of Health. On April 13, 1984, the Colorado State Department of Health notified the Texas Department of Health that several people in Colorado who had attended the convention had become ill. Following standard procedure, the Department of Health prepared a survey questionnaire which listed all food items from the establishments at which the members of the convention had eaten. The department contacted as many of the attendees as possible to ask the questions by phone.

The bacteria which caused the illness was identified as Shigella sonnei. Gustafson had only dealt with Shigella four or five times. It is a rare cause of food-borne illness. Shigella causes gastroenteritis in humans, but is not carried by, and does not affect, animals. Gustafson testified he believed it was either the meats or barbecue sauce, made with water, which contained the Shigella. Gustafson stated it was equally likely that either a food handler had Shigella and had contaminated hands, or the water itself became contaminated.

Upon investigating water samples, the Hilton Hotel water passed normal tests. Two samples of the water from Austin Ranch showed fecal coliforms—bacteria found in feces; two or three samples were clear. Fecal coliforms do not transmit, and are not, Shigella sonnei. They are other bacteria that are an indicator organism that the water supply might be contaminated. The samples were taken from at least two different taps at Austin Ranch. Gustafson testified the only significance in finding fecal coliforms in the water supply is that it makes possible there was back siphonage and cross-contamination or other plumbing problems.

It was noted, during an inspection, there was an outdoor faucet hose left in the horse trough making back siphonage possible. Back siphonage is when water meant to go in one direction goes in the opposite direction due to low pressure in another part of the plumbing system, which causes water fluctuations. Upon further inspection, no water fluctuations were found. Further, Shigella is a human bacteria, not animal; human feces would have to be in the horse trough. No cross-connections were found. The Department of Health does not know the exact source of the illness. Shigella was never isolated from the water. Gustafson stated it is possible the fecal coliforms were introduced at a central distribution point, or there were breaks in the water lines between the distribution point and the building.

The food handlers were examined on April 13th and were found not to have Shigella. Gustafson stated it is possible the food handlers could have had the infection on April 3rd and no longer have it ten days later when the examinations were made.

The chlorine residual in the water was .4 parts per million, lower than the expected 1 part per million in drinking water. Lower chlorine makes it easier for bacteria introduced into the water to survive. Water in the utility district where the Hilton and Austin Ranch are located was hyperchlorinated by the City of Grapevine, and follow-up water specimens on April 16th and 20th from Austin Ranch were negative for coliforms. All information pertaining to laboratory results from the food handlers and water samples were received from the Tarrant County Health Department.

Gustafson testified the expected duration of this type of illness is two to seven days, with or without treatment. Shigella only lives for a certain period of time. Shigella bacteria dies at 140 degrees Fahrenheit.

Of the 127 people surveyed, only 50 became ill, constituting 39%. Between the 4th and 8th of April, the incubation time pinpointed by Gustafson, 78% of the cases experienced illness. Gustafson testified the evidence strongly showed that one of the meats is associated with the illness. But 3 of the attendees became ill prior to April 4th. After April 9th, 8 people became ill. Of those who either did not eat at Austin Ranch or did not eat the barbecue

meat, only 6 became ill. Shigella was only isolated in 2 of 50 people because not all of the cases were serious enought to need a doctor or have a culture made. Another food associated with illness was the hot dogs served at a hamburger lunch on April 4th. Only 36% of the cases ate the hot dogs, and the Department of Health does not believe it was a likely source of illness.

Austin Ranch had previously been cited for failure to have backflow preventative devices on the premises, prior to the occurrence in question.

Michael Burt, Sanitarian and Territory Manager of Tarrant County Health Department, inspects the establishments he is responsible for on a routine basis. The department follows the State Food Rules which are guidelines restaurants are to follow for the protection of consumers. Burt testified to inspection reports of Austin Ranch from July 29, 1983, which contained 3 violations of potential cross-connections, 2 minor, 1 major. On October 28, 1983, there was 1 repeat violation. On February 13, 1984, there was a violation with instructions to install backflow devices on all hose connections on the premises. On April 18, 1984, there is a cross-connection violation listed. A memo to the Tarrant County Health Department from the Fort Worth Health Department, also dated April 18, 1984, stated that no cross-connections and no line pressure fluctuations were observed after inspections. The memo contained a list of things to be rectified by Austin Ranch. Cultures taken on April 16, 19, and 20, 1984, for Shigella were negative. On April 25, 1984, one further violation was found. Some corrections were made after the July 29, 1983 and October 28, 1983 inspections. The April 16, 18, and 24 reports revolve around the present incident. Burt admitted in order for backflow to take place, there must be some sort of line pressure fluctuations; none were found.

Dale Michaud, Environmental Quality Supervisor of Tarrant County Health Department, testified that hyperchlorinating the water after the incident in question was a precautionary measure arising from the implication that the city water supply was contaminated. Michaud relied on the City of Fort Worth's testing for line pressure fluctuations, and did not conduct any of his own.

The deposition of Larry Heinonen, Wells' doctor, was read to the jury. He first saw Wells on April 8, 1984, after she arrived at the emergency room. Heinonen diagnosed Wells as having a moderately severe case of bacterial diarrhea and colitis caused from Shigella sonnei. Heinonen testified Wells' spastic colon initially may have been associated with the irritation and Shigella infection. The majority of the time, stress is the cause of a spastic colon; it is very common and probably thirty to forty percent of the patients referred to him with abdominal pain have a spastic colon. On May 7, 1984, Wells had mild colitis, with the majority of the mucosa appearing normal and a stool culture also normal; the Shigella was out of her system. Subsequent bleeding was probably caused by the effect the disease had on Wells' colon. After six months, he doubted there would be any direct relationship between her spastic colon and the Shigella infection. There should be no permanent effects of a bacterial infection such as Shigella.

Patricia Stinson, director of sales and marketing at Austin Ranch, testified the restaurant serves an average of 45,000 to 50,000 meals (people) per year since 1983. In excess of fifty percent of their business is referral business. Stinson has never received any complaints about anyone becoming ill due to food served by Austin Ranch, with the exception of the present case. In April of 1984 Stinson had 18 parties with no other complaints. She has no contact with the Health Department.

Phillip Whittlesey, Jr. is the present owner of Austin Ranch, and has been since 1963. He testified the procedures for food handlers require washing their hands after using the restroom; wearing elbow-length plastic gloves for handling food which are in a dispenser box in the kitchen; and wearing elastic binder caps to keep their heads covered. The horse trough previously discussed is approximately 2,000 feet away from the kitchen yard. Austin Ranch

does not have enough hose to reach the horse trough. To fill the trough, water was hauled in fifty-gallon drums on the back of a pickup. The drums are filled with a water hose attached to a bib in the kitchen yard. The faucet in the kitchen yard outside the main door had a backflow preventer in 1984. Those garden faucets with seventy-five pounds per square inch pressure did not have backflow prevention devices, as they were not needed. The four-compartment sink complained of is not in the kitchen, but behind the main bar in the roundup room. Austin Ranch gets its water from the Hilton which comes from the City of Grapevine; the restaurant is at the end of the water pipeline. Whittlesey testified there has never been any cross-connections at the Austin Ranch. All food handlers gave specimens to the Department of Health, and were found not to be infected.

Wells testified, during rebuttal, the food handlers she saw were not wearing gloves on their hands, although she did not recall if they touched the food—they were using tongs.

 With regard to gross negligence, the plaintiff must first show the actor engaged in willful, wanton, malicious, or grossly negligent conduct. The test for gross negligence is both an objective and subjective test. The defendant's gross negligence may be proven by showing he had actual subjective knowledge his conduct created an extreme degree of risk. In addition, a defendant's gross negligence may be objectively proven by proving that, under the surrounding circumstances, a reasonable person would have realized his conduct created an extreme risk to the safety of others. *Williams v. Steves Industries, Inc.*, 699 S.W.2d 570, 573 (Tex. 1985). To be entitled to exemplary damages, a plaintiff must show an entire want of care which would raise the belief that the act or omission complained of was the result of conscious indifference to the right or welfare of the person or persons to be affected by it. In other words, the plaintiff must show the defendant knew about the peril, but his acts or omissions demonstrat-

ed he did not care. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981). Appellee has not met that burden. She has not shown appellant maliciously allowed the water to become contaminated nor appellant wantonly disregarded procedures concerning the hygiene and cleanliness of the food handlers.

Reviewing only the evidence favorable to the jury finding, we find there is some evidence to support a finding of gross negligence. Appellant's first point of error is overruled. Reviewing all the evidence, we hold there is insufficient evidence to support a jury finding of gross negligence.

The Department of Health does not know the exact source of the illness. Three attendees became ill prior to April 4th; eight became ill after April 9th. Six others became ill who either did not attend the barbecue or attended and did not eat the barbecue meat. The fecal coliforms found are not Shigella per se; they are an indicator that the water supply might be contaminated.

Two ways first mentioned for the Shigella to be transmitted were either the food handlers or the water supply. All food handlers gave specimens to the Department of Health; all tests were negative. The two ways appellee relied on to prove a contaminated water supply were back siphonage and cross-connections. In order for back siphonage to occur, there must be some sort of line fluctuations somewhere; none were found. Moreover, contaminated water could not have come from the horse trough. Shigella is a human bacteria, the only possible way in which the trough water could have been contaminated with Shigella is if there were human feces in the trough. There was no proof of such contamination. Moreover, Whittlesley testified the faucet in question had a backflow prevention device attached. The memo on April 18, 1984, from the Fort Worth Health Department stated there were no cross-connections. Some corrections were made after inspections by the Department of Health.

Shigella dies at 140 degrees Fahrenheit. Water is an ingredient of the barbeque

sauce; there is no evidence as to whether the sauce was cooked or heated to 140 degrees, which would have killed any Shigella present and eliminated the barbeque sauce from being one of the allegedly contaminated foods. Shigella was never isolated in any of the water samples taken at Austin Ranch. Further, had the chlorine level been too low, it would have been due to negligence on the part of the City of Grapevine, not Austin Ranch.

Finally, appellee's expert admitted there were other possibilities as to how fecal coliforms could have gotten into the water, such as being introduced at a central distribution point or possible breaks in the water lines somewhere between the distribution point and Austin Ranch. Appellee has not met her burden of showing that appellant exhibited an entire want of care with regard to the safety of others, as a result of its conscious indifference. *Burk,* 616 S.W. 2d at 920.

Appellant's second point of error is sustained.

■■■■ Addressing appellant's third and fourth points of error, proximate cause is cause which, in a natural and continuous sequence produces an event, and without such cause, such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that event, or some similar event, might reasonably result therefrom. *City of Gladewater v. Pike,* 727 S.W.2d 514, 517 (Tex.1987). Thus, the two elements of proximate cause are cause in fact and foreseeability. *Id.; Williams,* 699 S.W.2d at 575. Negligent conduct is a cause in fact of harm if it is a substantial factor in bringing about the harm. *Greenstein, et al. v. Burgess Marketing,* 744 S.W.2d 170, 186 (Tex.App.— Waco 1987, writ denied). A negligent act or omission is not cause in fact unless, but for the conduct in question, the event would not have happened. *Kerby v. Abilene Christian College,* 503 S.W.2d 526, 528 (Tex.1973). Foreseeability requires the actor, as a person of ordinary intelligence, would have anticipated the danger that his

negligent act created for others. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 549–50 (Tex.1985).

■■■■ To begin with, it is clear, under the facts here, the injury was foreseeable. The reason for inspections and regulations is for the protection of consumers against such an occurrence as happened here. *See City of Gladewater,* 727 S.W.2d at 517–18. We note proximate cause may not be established by a mere guess or conjecture, but must be proved by evidence of probative force. *McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 904 (Tex.1980). The issue here is whether there was any evidence, or insufficient evidence to support a finding that the negligence, which was a cause in fact of the injury was gross negligence. Appellant received no other complaints from any patrons until the present case, which included serving 45,000 to 50,-000 meals (people) per year. After inspections were made (by the same inspector), corrections were also made. There is no evidence public health authorities took any action to close the facility or revoke its license. The City of Grapevine hyperchlorinated its own water only as a precautionary measure.

Reviewing only the evidence favorable to the jury finding, we find there is some evidence to support a finding of proximate cause. Appellant's third point of error is overruled. Reviewing all of the evidence, we hold there is insufficient evidence to support a finding that appellant's conduct was willful, wanton, malicious or grossly negligent or showed an entire want of care or conscious indifference for the safety of others. *Williams,* 699 S.W.2d at 572. Appellant's fourth point of error is sustained.

By its fifth and sixth points of error, appellant contends the trial court erred in permitting Bryan Arnold to testify to attorney's fees and Dale Michaud to testify as to the investigation because they were not designated as witnesses on interrogatories propounded by Hilton. Hilton was a party to the case, but had already settled and did not participate in trial. Appellant did not propound any discovery requests to appel-

lee during the preparation of the present case.

Texas Rules of Civil Procedure 215(2)(b) pertains to sanctions by the court in which an action is pending, for failure to comply with an order or discovery request. Failure to identify persons with knowledge of relevant facts, upon *proper request,* results in the automatic exclusion of those witnesses' testimony at the time of trial. *Morrow v. H.E.B.,* 714 S.W.2d 297, 298 (Tex.1986) (per curiam) (emphasis added). If a party demonstrates that: 1) it made a proper discovery request; 2) the witness was not disclosed in answers to the request; 3) the appellant objected to the admission of evidence on the grounds the witness was not disclosed in answers to a specific discovery request; and 4) the court does not find that good cause existed for the failure to disclose the witness, we must reverse the judgment of the trial court. *Id.* Texas Rules of Civil Procedure 168 relates to interrogatories. Subsection 2 of that rule pertaining to the scope of interrogatories, states in part that "it is sufficient answer to such interrogatory to specify the records from which the answer may be derived as ascertained and, if applicable, *to afford to the party serving the interrogatory* reasonable opportunity to examine, audit, or inspect such records." TEX. R.CIV.P. 168(2) (emphasis added). Subsection 4 of that rule pertains to the time in which the party served must answer. That section states, in part, "[t]he party upon whom the interrogatories have been served *shall serve answers on the party submitting the interrogatories."* TEX.R.CIV.P. 168(4) (emphasis added). Under this rule appellee is required to answer only the proponent of the interrogatories, not all parties. *Id.; see Cox v. Realty Development Corp.,* 748 S.W.2d 492, 494 (Tex.App. —Dallas 1988, no writ). Therefore, appellant cannot rely on whether appellee properly supplemented her answers to the interrogatories propounded by Hilton. We note the 14th District Houston Court of Appeals has held a party must be able to rely on the interrogatories and answers of other parties. *Smith v. Christley,* 755 S.W.2d 525, 530 (Tex.App.—Houston [14th Dist.] 1988)

(opinion on rehearing). This is distinguished from the case at bar in which appellee did not supplement her answers, therefore leaving no answers for the third party to rely upon. We do not believe rule 168 requires appellee to *supplement* his answers to a party who has settled, and is no longer part of the lawsuit, thus distinguishable from *Smith.* Appellant's fifth and sixth points of error are overruled.

Appellant's seventh and eighth points of error complain of attorney's fees and medical expenses being granted by the trial court. An appellate court is not authorized to reverse a trial court's judgment in absence of properly assigned error. *Texas Nat. Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986); *State Board of Insurance v. Westland Film Industries,* 705 S.W.2d 695, 696 (Tex.1986) (per curiam). Issues not presented to the trial court may not be considered on appeal without fundamental error, which is rare. *See Cent. Educ. Agency v. Burke,* 711 S.W.2d 7, 8 (Tex.1986); *Aero Energy, Inc. v. Circle C Drilling Co.,* 699 S.W.2d 821, 823 (Tex. 1985); TEX.R.APP.P. 52(a). Appellant failed to preserve its error in both of these no evidence points by any of the five methods prescribed in *Aero Energy.* Appellant's seventh and eighth points of error are overruled.

Pursuant to Texas Rules of Appellate Procedure 85, due to the lack of sufficient evidence to affirm exemplary damages, we find the award of $27,500 improperly granted, and the trial court erred in not suggesting a remittitur.

Therefore, if within 30 days from the date of this opinion appellee files, in this court, a remittitur of $27,500, the judgment of the trial court will be reformed, and the award of $2,500 for physical pain and mental anguish, $3,854.15 for medical expenses, $9,500 for legal expenses, and $5,681.75 prejudgment interest will be affirmed. Payment of subrogation interest will also be affirmed, as such recovery is not before this court. Otherwise, the cause will be reversed and remanded for a new trial on all issues.

## JUDGMENT

On September 29, 1988 this court handed down its opinion providing that if remittitur of $27,500 was not made by the appellee within thirty (30) days the cause would be reversed and remanded. No remittur having been filed, it is the JUDGMENT of this court that the judgment of the court below is reversed and remanded for new trial on all issues.

It is further ordered that appellee, Gloria C. Wells, pay all costs in this behalf expended, for which let execution issue, and that this decision be certified below for observance.