**GENERAL CHEMICAL CORPORATION,**
Appellant,

v.

**Gonzalo De La LASTRA,**
**et al., Appellees.**

No. 13–90–340–CV.

Court of Appeals of Texas,
Corpus Christi.

June 18, 1991.

Opinion on Motion for Rehearing
Sept. 5, 1991.

Second Rehearing Overruled Oct. 3, 1991.

Royal H. Brin, Jr., Strasburger & Price, Dallas, Guy Allison, Allison & Huerta, Corpus Christi, John William Black, Black, Hamilton, Roerig & Yanez, Brownsville, James Kronzer, Houston, for appellant.

Thomas F. Nye, Alan J. Couture, Brin & Brin, Corpus Christi, Elizabeth Davis, Law Offices of Warren Eddington, Houston, Ray R. Marchan, Brownsville, for appellees.

Before SEERDEN, KENNEDY and DORSEY, JJ.

## OPINION

SEERDEN, Justice.

This is a products liability case. Gonzalo and Amanda De La Lastra sued General Chemical Corporation for the wrongful deaths of their sons, Gustavo and Jose De La Lastra, who died from sulfur dioxide poisoning while using General Chemical's product. Appellees' cause of action was based on strict liability, negligence, and gross negligence in manufacturing, packaging, distributing and selling a product with knowledge that the product could cause serious bodily injury or death and in failing to warn of such dangers. A jury found that appellant's warnings on the product's package were inadequate and awarded actual and exemplary damages to appellees. Appellant brings ten points of error, complaining primarily of the sufficiency of the evidence to support the jury's findings and the excessiveness of the actual and punitive damage awards. We affirm.

General Chemical Corporation is the manufacturer of sodium metabisulfite, a chemical product used by shrimpers to preserve the color of shrimp after it is caught. It is commonly referred to in the shrimping industry as "shrimp dip." According to trial testimony, the chemical is used by shrimpers either by making it into a solution into which shrimp are dipped, or by sprinkling the dry product over layers of shrimp and ice.

The decedents were brothers who worked as commercial fishermen on the "Wilderness," a fishing vessel, that operated in the waters outside of Brownsville, Texas, and who frequently used the sprinkle method of distributing sodium metabisulfite on their shrimp to preserve its color. In July 1988, the brothers, along with Gustavo's girlfriend, Leticia Serrata, went out on the vessel for a shrimping expedition. On July 7, 1988, at approximately 2:30 a.m., Gustavo awoke Serrata and asked her to keep watch while he went to assist Jose to "put the shrimp away," referring to the use of General Chemical's product to preserve the shrimp until they reached shore. Serrata remained at the captain's chair for

approximately three hours. Around 5:30 a.m., another shrimp boat approached, and Serrata became worried that the boat might collide with Wilderness. She called for Gustavo, and when he did not respond, she went looking for the brothers. She found them lying in the hold of the boat unconscious. When they would not awake, she returned to the captain's chair and called the Coast Guard. She was instructed to drop anchor. A rescue team boarded the vessel and navigated it to the Brownsville Shrimp Basin. Gustavo and Jose were pronounced dead on arrival at Brownsville National Airport. The cause of the deaths was asphyxiation.

■ By its first point of error, appellants complain that the trial court erred in awarding judgment against it because there is no evidence or insufficient evidence to support the jury's findings that the warnings on its product were inadequate. In reviewing the legal sufficiency of the evidence in this case, we will consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *International Armament Corp. v. King*, 686 S.W.2d 595, 597 (Tex.1985); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In re King's Estate*, 244 S.W.2d at 661–62. In reviewing the factual sufficiency, we will consider all of the evidence which supports and which is contrary to the jury's determination. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We will set aside the verdict only if the evidence, standing alone, is too weak to support the finding, or the answer is so against the overwhelming weight of the evidence that it is manifestly unjust or clearly wrong. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

■ In Texas, a warning of danger or instruction for safe use is legally adequate if it 1) is in a form that could be reasonably expected to catch the attention of a reasonably prudent person in the circumstances of the product's use; 2) is of such nature as to be comprehensible to the average user and 3) must convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person. *Bituminous Casualty Corp. v. Black & Decker Mfg. Co.*, 518 S.W.2d 868, 872–73 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.). The question of whether or not a given warning is legally sufficient depends upon the language used and the impression that such language is calculated to make upon the mind of the average user of the product. *Id.* Implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger. *Id.* This is true because one who sells a product with a high risk of human harm is legally obligated to provide specifications, instructions, and warnings so that it is reasonably safe for use by ordinary persons. *Id.* The adequacy of a warning is a question of fact for the jury's determination. *Id; Ford Motor Co. v. Nowak*, 638 S.W.2d 582, 592 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). Appellant's warnings on the package stated:

> Can irritate the skin, eyes and respiratory tract. Prolonged exposure may cause burns. Harmful if ingested. (May cause severe allergic reaction in some asthmatics and sulfite sensitive individuals). Reacts with acids and water, releasing toxic sulfur dioxide gas.

Expert testimony introduced at trial reveals that sodium metabisulfite, when applied to wet ice, liberates sulfur dioxide, a colorless, very poisonous gas. Dr. Morris Cramer, a toxicologist, testified that because of the similarity of sodium metabisulfite to sodium bisulfite, a chemical that does not produce a poisonous gas when applied to wet ice, a need for a warning on sodium metabisulfite concerning its dangerous effect exists. He testified that it is critical to distinguish between the two compounds because they cannot be distinguished by looking at them, and they are used for the same general purposes. When dissolved in water, they react the same way. When applied to wet ice, however, sodium metabisulfite produces sulfur

dioxide gas. Cramer testified that the warning on the General Chemical label significantly did not emphasize that the product can produce a lethal gas, and the emphasis should be on the fact that it can be fatal or can cause death. Without a clear warning to this effect, Cramer testified, the warning was below the standard expected of a chemical company. Moreover, Cramer stated that if the company had knowledge of prior deaths caused by the product being used in the same manner, the failure of General Chemical to put an adequate warning label on its product would show conscious indifference to the rights of the products' users. He found it inexcusable that appellant did not warn product users of the possibility of death.

Appellant argues in its brief that its warning was adequate because it stated that the product could be "toxic" which, according to Webster's New Collegiate Dictionary, "means 'poisonous' which in turn means capable of causing injury or death by chemical action." Lee Jones, General Chemical's product safety manager, testified about the use of the word "toxic":

Q: By the way, burning eyes, is a toxic reaction?

A: Yes.

Q: So if you knew it can cause your eyes to burn and reads "toxic" and knows [sic] it can cause your throat to get a little raw and has read "toxic"— he has read the only things on your label that are toxic, has he not?

A: Going down through it, it is mentioned a few times on the label, yes.

Q: Don't you think that death is a little more highly toxic than burning eyes?

A: Death is also a toxic reaction.

Q: Yes sir. Don't you think it's a little more substantial toxic reaction than burning eyes?

A: Oh, yes.

This testimony demonstrates that varying degrees of toxicity exist. While appellant's label warned of some of the toxic reactions—burning eyes and throat—it did not warn of the most serious one—death. We conclude that there is sufficient evidence to sustain the jury's finding that

appellant's warning was inadequate. Appellant's first point of error is overruled.

By its second point of error, appellant asserts that there was no evidence or insufficient evidence to support the jury's findings that attributed 100 percent of the causative fault to appellant. A question was submitted to the jury which asked what percentage of fault was attributable to each party, including the distributor of the product, Western Trawl and Supply Company. The jury attributed all of the fault to appellant. Appellant admitted at trial that it was the manufacturer of the sodium metabisulfite that the De La Lastra brothers used. It also acknowledged that it knew that the chemical had the potential to release sulfur dioxide gas that can cause death. Edward Pengrass, Retired Commander of the United States Coast Guard, testified that he was in charge of investigating a 1973 Brownsville incident on a shrimp boat named the "Cape Rojo," on which two shrimpers died from sulfur dioxide poisoning. As a result of his investigation, the Commander of the United States Coast Guard, Casualty Review Branch, wrote a letter to Allied Chemical, General Chemical's predecessor, enclosing a copy of Pengrass' report, stating:

There is evidence that the chemical, Sodium Bisulfite Anhydrous [sodium metabisulfite], used as a shrimp preservative, was mixed with melting ice in the vessel's hold, and liberated sulfur dioxide gas in sufficient quantity to cause asphyxia and death of Mr. Ramirez and Mr. DeLeon.

Inasmuch as the product involved may have been manufactured by Allied Chemical Corporation, a copy of the investigative report is forwarded for your information. Promulgation and dissemination of safety information regarding this product may be indicated.

Pengrass' recommendation stated:

It is recommended that since ... sodium bisulfite anhydrous is widely used by fishermen throughout the industry ... an expedious means be devised to warn users of the chemical ... aboard vessels ... of the potential dangers involved in

its use in a confined and unventilated space.

Frances Painter, a representative of Western Trawl, testified that no one at Western Trawl knew of any complaints about the product, and that General Chemical never told anyone at Western Trawl about its knowledge of the 1973 Cape Rojo incident. Painter further testified that the first time it knew that the gas liberated from sodium bisulfite could cause death was when it received notice of the instant suit. Accordingly, there is sufficient evidence to support the jury's finding. Appellant's second point of error is overruled.

■ By its third point of error, appellant complains that there is no evidence or insufficient evidence that the inadequate warning was a proximate or producing cause of the deaths of the De La Lastra brothers. Appellant bases this argument on the premise that the De La Lastras did not read its warning.

■ Proximate cause is cause which, in a natural and continuous sequence, produces an event, and without such cause, such event would not have occurred. *Austin Ranch Enter., Inc. v. Wells*, 760 S.W.2d 703, 709 (Tex.App.—Fort Worth 1988, writ denied). A producing cause is an efficient, exciting, or contributing cause, which in natural sequence, produced injuries or damages of which the plaintiff complains. *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). There can be more than one producing cause that contributes to the plaintiff's injury, but as long as the defect was a contributing cause, it is not necessary to establish that the defect was the only producing cause. *See Simms v. Southwest Texas Methodist Hospital*, 535 S.W.2d 192, 197 (Tex.Civ.App.—San Antonio 1976, writ ref'd n.r.e.). When a manufacturer fails to give adequate warnings or instructions, a rebuttable presumption arises that the user would have read and heeded such warnings or instructions. *Magro v. Ragsdale Bros. Inc.*, 721 S.W.2d 832, 834 (Tex.1986). The presumption may be rebutted with evidence that the user was blind, illiterate, intoxicated at the time of the product's use, irresponsible, lax in

judgment, or by some other circumstance tending to show that the improper use would have occurred regardless of the proposed warnings or instructions. *Id.* Appellant offered no evidence that the De La Lastra brothers knew that the chemical could cause death when used in the dry form but used it anyway; the only knowledge of this fact was imputed to appellant. Moreover, even if the brothers read and heeded the warning, it failed to warn of the extreme dangerousness of the product, i.e., death. The evidence is sufficient to support the jury's finding that the inadequate warning was the proximate or producing cause of the De La Lastra brothers' deaths. Appellant's third point of error is overruled.

■ By its fourth point of error, appellant argues that there is no evidence or insufficient evidence to support the award of exemplary damages. Appellant relies on *Burk Royalty v. Walls*, 616 S.W.2d 911 (Tex.1981), in which the Supreme Court reaffirmed the definition of gross negligence which justifies an award of exemplary damages:

> [gross negligence] means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the persons affected by it.

*Burk Royalty*, 616 S.W.2d at 920.

In 1987, the Legislature added the word "actual" to the *Burk Royalty* definition, and has replaced "indicate" with "establish," so that the statute now reads:

> "Gross negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to *establish* that the act or omission was the result of *actual*, conscious indifference to the rights, safety, or welfare of the person affected. (emphasis added).

Tex.Civ.Prac. & Rem.Code Ann. § 41.001(5) (Vernon Supp.1991).

The evidence introduced at trial, through Commander Pangrass and Samuel Bean, General Chemical's Manager of Technology

Development, showed that General Chemical was aware of other deaths caused by sodium metabisulfite: specifically, the 1973 Cape Rojo incident. On the day of trial, pursuant to appellee's motion to compel discovery, General Chemical produced files that it had taken over from Allied Chemical which contained a letter from the United States Coast Guard recommending that Allied Chemical warn users of the chemical aboard vessels of the dangers associated with the product. This recommendation was attached to an investigative report which showed that the two men aboard the Cape Rojo had asphyxiated from sulfur dioxide fumes. Commander Pengrass testified that General Chemical had not complied with the Coast Guard's recommendations. Further testimony established through appellant's agents and representatives showed that appellant knew of other incidents involving deaths or injuries resulting from the chemical. Finally, a representative of General Chemical testified that the company had no plans to change its label to include a warning that the product may cause death, regardless of the jury's verdict. A review of the record reveals that the evidence is sufficient to support the jury's finding that appellant acted with such an entire want of care as to establish that the act or omission was the result of actual, conscious indifference to the rights, safety, or welfare of the De La Lastra brothers. Appellant's fourth point of error is overruled.

By its fifth point of error, appellant asserts that the court erred in awarding exemplary damages because they were in excess of the statutory limit imposed by Tex.Civ.Prac. & Rem.Code Ann. § 41.007 (Vernon Supp.1991), Section 41.007 states:

Except as provided by Section 41.008, exemplary damages awarded against a defendant may not exceed four times the amount of actual damages or $200,000, whichever is greater.

Section 41.008 provides:

Section 41.007 does not apply to exemplary damages resulting from malice as defined by Section 41.001(6)(a) or to an intentional tort.

Section 41.001(6) provides:

Malice means:

(A) Conduct that is specifically intended by the defendant to cause substantial injury to the claimant; or

(B) An act that is carried out by the defendant with a flagrant disregard for the rights of others and with actual awareness on the part of the defendant that the act will, in reasonable probability, result in human death, great bodily harm, or property damage.

Appellant concedes that it did not submit a question regarding Section 41.001(6)(A) to the jury. Instead, a question was asked which tracked the language of Section 41.-001(6)(B). The jury answered this question in the affirmative. Accordingly, the limitation enunciated in Section 41.007 applies.

We believe the determination of this issue rests in the definition of "claimant" under the statute. Section 41.001(1) defines this term as follows:

"Claimant" means a party, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff, seeking recovery of exemplary damages. In a cause of action in which a party seeks recovery of exemplary damages related to injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery of exemplary damages.

Senator John T. Montford, principal draftsman of the this chapter (also commonly known as "Tort Reform" legislation), states:

[a]ny party, however procedurally postured, who seeks recovery of exemplary damages covered by Chapter 41 is a claimant for all purposes of this chapter. Since the term claimant includes both (a) a party seeking recovery of exemplary damages related to another person's injury, death, property damage, or other harm, and (b) that other person, when a spouse seeks exemplary damages related to an injury, death, property damage, or

harm involving the other spouse, both spouses are included under the term claimant for all chapter 41 purposes, including the section 41.008 cap. *Likewise, when either or both parents seek exemplary damages related to a child's injury, death, property damage, or other harm, both the parent(s) and the child are included under the term claimant.* See Montford and Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System Part Two,* 25 Houston Law Review 245, 316 (1988). Montford further explains the intention behind Section 41.007, which limits the amount of recovery:

> Under this section, a claimant cannot recover exemplary damages from any one defendant in excess of four times the amount of the *claimant's* actual damages.... (emphasis added).

It is apparent, then, that both Gonzalo and Amanda De La Lastra and the estate of their son Gustavo fall under the category of "claimant" within the meaning of the statute. Likewise, Gonzalo and Amanda and the estate of Jose are a "claimant." The jury awarded $5,502,500 to Gonzalo and Amanda as damages for the death of Gustavo, and $1,000,000 to his estate. Therefore, exemplary damages cannot exceed four times the amount of $6,502,500. In this case, the jury awarded $15,000,000 in exemplary damages to the claimant, which is not in excess of the statutory limit. The same is true for the exemplary damages awarded against appellant for the death of Jose.

Appellants rely on *Hofer v. Lavender,* 679 S.W.2d 470 (Tex.1984), which held that parents cannot recover exemplary damages under the Wrongful Death Act. The court in *Hofer,* however, stated that "exemplary damages survive to the estate, whoever the beneficiaries of that estate may be." *Id.* at 476. In the instant case, the beneficiaries of the estate are Gonzalo and Amanda De La Lastra. Appellant's fifth point of error is overruled.

By its sixth point of error, appellant contends that the trial court erred in entering judgment for exemplary damages

because they were excessive even apart from the statutory limit. In *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981), the Supreme Court set forth guidelines which should be considered by an appellate court in determining whether an award of exemplary damages is excessive. They are:

1) the nature of the wrong;
2) the character of the conduct involved;
3) the degree of culpability of the wrongdoer;
4) the situation and sensibilities of the parties concerned; and,
5) the extent to which the conduct offends a public sense of justice and propriety.

The record reflects that the deaths of the De La Lastra brothers were caused by a product that appellant manufactured, sold and distributed with knowledge that the chemical could cause death upon reaction with ice, but did not attempt to adequately warn of this danger. Moreover, appellant expressed no remorse at trial; in fact, a General Chemical representative testified that regardless of what the jury found, the De La Lastra parents could not get it to change its label to warn future users. A review of this evidence and the evidence detailed under the discussion of appellant's fourth point of error above in light of the *Kraus* factors leads us to conclude that the award of exemplary damages was not excessive. Appellant's sixth point of error is overruled.

By its seventh point of error, appellant alleges that the trial court erred in awarding exemplary damages because the present Texas system and practice with respect to exemplary damages is in violation of the United States and Texas Constitutions, and in particular the due process and equal protection clauses thereof.

The United States first sanctioned the use of punitive damages in *Day v. Woodworth,* 13 How. 363, 371, 14 L.Ed. 181 (1852):

> It is a well-established principle of the common law, that in actions of trespass and all actions on the case for torts, a

jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offence rather than the measure of compensation to the plaintiff.

In *Graham v. Roder*, 5 Tex. 141 (1849), our Texas Supreme Court noted that, in cases involving malice, vexation, fraud, or oppression, the jury could, for purposes of punishment, award "damages not only to recompense the sufferer, but to punish the offender." Several years later, in *Cole v. Tucker*, 6 Tex. 141 (1856) the court again noted the need for damages separate from compensatory ones when the defendant's conduct warranted it.[1] In *Bisso v. Southworth*, 71 Tex. 765, 10 S.W. 523 (1888), the Court noted that the factors to be considered in determining punitive damages were inconvenience, attorneys' fees, mental anguish, the sense of being wronged and insulted, and other losses too remote to be considered actual damages. The purpose of punitive damages was reexamined in *Hofer v. Lavender*, 679 S.W.2d 470 (Tex. 1984), in which case the Court found that such damages were intended to 1) punish the wrongdoer; 2) serve as a deterrent to others for the good of the public; 3) reimburse the plaintiff for losses too remote or speculative to be considered elements of strict compensation; and 4) compensate the plaintiff for inconvenience and attorneys fees. *Id.* at 474.

Recently, in *Pacific Mutual Life Ins. Co. v. Haslip*, —— U.S. ——, ——, 111 S.Ct. 1032, 1046–1047, 113 L.Ed.2d 1 (1991), a due process challenge to Alabama's punitive damage system failed because, the United States Supreme Court found, the defendant had the benefit of "the full panoply of Alabama's procedural protections" which included adequate instruction to the jury, a post-verdict hearing, and the benefit of review by the Alabama Supreme Court. Justice Scalia, concurring, noted:

Since it has been the traditional practice of American courts to leave punitive damages (where the evidence satisfies the legal requirements for imposing them) to the discretion of the jury; and since in my view a process that accords with such a tradition and does not violate the Bill of Rights necessarily constitutes "due" process; I would approve the procedure challenged here without further inquiry into its "fairness" or "reasonableness."

Texas also provides a defendant a number of procedural safeguards prior to the imposition of exemplary damages. In 1987, the 70th Texas Legislature passed significant tort reform legislation. Along with other revisions, Tex.Civ.Prac. & Rem. Code Ann. § 41.001–41.009 was enacted. The legislative history of this law confirms that it was intended to reform certain aspects of Texas exemplary damages common law, rather than to supplement or to replace that law. *See* Montford and Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System Part Two*, 25 Houston L.Rev. 245, 315 (1988). Among other things, this law:

1. limits the amount of exemplary damages recoverable in certain tort actions to the ratio of $200,000 or four times the amount of actual damages;

2. reduces the grounds for recovering exemplary damages in such suits to three statutorily defined standards: fraud, malice, and gross negligence;

3. modifies and tightens prior law regarding gross negligence as a basis for exemplary damages;

4. provides that the claimant's burden of proof cannot be satisfied by ordinary negligence or shifted to the defendant;

5. codifies the law that exemplary damages cannot be recovered if only nominal damages are awarded, or if the claimant elects multiple-damages under another statute;

6. confirms that there is no joint and several liability and no prejudgment interest with respect to exemplary damages; and

7. lists various statutory causes of action to which this law does not apply.

---

1. For an extensive discussion of the history of punitive damages in Texas, see Demarast, *The History of Punitive Damages in Texas,* 28 South Texas L.Rev. 535 (1987).

This case was tried pursuant to the 1987 legislation, and the jury was instructed accordingly. Appellants are provided with the procedural safeguards promulgated in Chapter 41 and Texas' appellate review system. Accordingly, we hold that appellant was not deprived of its due process by the imposition of exemplary damages against it and that the current system of imposing exemplary damages in Texas does not violate the Texas and United States Constitutions. Moreover, appellant made no constitutional objection to the court's charge regarding exemplary damages. Appellant's seventh point of error is overruled.

■■■ By its eighth point of error, appellant alleges that the trial court erred in awarding judgment to the estates of Gustavo and Eduardo because there is no evidence or, alternatively, insufficient evidence to support the finding that the decedents sustained conscious pain and suffering for such duration to warrant the recovery. According to the pathologist who performed autopsies on the decedents, the first sensation Gustavo and Jose experienced when they were overcome by the sulfur dioxide fumes was "air hunger" which is a feeling of being "out of breath." A toxicologist testified that sulfur dioxide poisoning impairs one's ability to escape. He stated that a first response to the poisoning would be a startled reflex and gasping, followed by burning eyes, throat, and nose, and then a heaving feeling on the chest, described as being similar to a heart attack—a crushing pain. The initial reaction is shock, because the person is scared and disoriented, in pain, and unable to breathe properly. The body then begins to starve other tissues oxygen in order to get it to the brain and heart, causing the body to lose strength and control in the arms and legs and peripheral system. Next, the person's ability to think clearly begins to decrease as the oxygen level in the brain decreases. Finally, he loses consciousness, goes into respiratory collapse, and dies within a few minutes. Both the pathologist and the toxicologist testified that bruises and lacerations on Jose's body were consistent with his trying to climb out of the hold and falling back down. This evidence is sufficient to support the jury's finding. Appellant's eighth point of error is overruled.

■■■ By its ninth point of error, appellant complains that the trial court erred in excluding any evidence, mention, or information from the jury that at the time in question, shrimping within one marine league (three nautical miles) from shore was unlawful.

Prior to trial, appellees sought by motion in limine to exclude any evidence to the possible violation of state law relating to the areas in which they were shrimping. By way of bill of exception, appellant attempted to offer evidence that on the date in question, the waters extending from the Texas shoreline out to three marine leagues (nine nautical miles) were closed to shrimping. Appellant's contention was that the location of the boat at the time of the deaths was at least one marine league from the Texas coast, so that any recovery would have to be under the Death on the High Seas Act, 46 U.S.C.A.App. § 761–762. Appellees contended that the deaths occurred within one marine league, so that Texas' common and statutory law would govern. Conflicting testimony was offered on both sides, and the jury found that both deaths occurred within one marine league.

Appellant argues that evidence that the Wilderness was within illegal shrimping territory makes "it more likely that the decedents had proceeded toward a legal area and were more than one marine league from shore, either to comply with the law or to avoid being caught in violation of it."

Edward Pengrass, retired Commander of the Coast Guard, stated that based on the longitude and latitude readings that established the vessel's location, the landmark description by Leticia Serrata, and the environmental conditions, it was his opinion that the vessel was within three nautical miles of shore. The decedents' father testified that he knew that the brothers were fishing just south of the Port Mansfield Jetties because he had made arrangements

to send some groceries out to them on another vessel, and he knew that the brothers had planned to fish within the limit. The excluded evidence would have in fact helped establish the appellees' claim that it was within one marine league. Even the court, making its determination, noted the irony in appellant's reasoning:

[i]f proof of the law violation helped you other than to just prejudice the jury, if it helped from the standpoint of proving your point, I would be more inclined to let it in.

But it seems like proof of the law violation helps the Plaintiff's proof in this case. And so if they would rather not have their proof helped by having the jury find out about the law violation, I am inclined to go along at this time.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or the needless presentation of cumulative evidence. *See* Tex.R.Civ.Evid. 403. Here, other evidence offered showed that the Wilderness was within one marine league from shore; any other evidence would have been cumulative. A trial court may, in its discretion, limit the amount of evidence on a particular issue. Exclusion of cumulative evidence is not reversible error absent an abuse of discretion. *Bullard v. Universal Underwriters, Ins. Co.*, 609 S.W.2d 621, 626 (Tex. Civ.App.—Amarillo 1980, no writ). Appellant's ninth point is overruled.

By its tenth point of error, appellant complains that the trial court erred in awarding judgment to Gustavo and Amanda individually under the Wrongful Death Act because the awards for pecuniary loss, loss of companionship and society, and mental anguish were excessive and not supported by factually sufficient evidence.

### Pecuniary Damages

▪ The evidence at trial showed that both sons lived with their parents, and all of their income went to the household. The decedents' father testified that the boys also performed services of pecuniary value, such as maintaining the family automobiles both the interior and exterior of the house. At the time of their deaths, Gustavo and Jose were in the process of substantially renovating and building additions to the house. An economist testified that Gustavo and Jose would have earned disposable lifetime income in the amounts of $423,000 and $410,000, respectively. The award is supported by the evidence.

### Non–Pecuniary Damages

▪ Evidence presented showed that Gustavo and Jose were extremely close to their parents. Prior to their deaths, the family shared many activities together. A psychologist testified that the loss of a child is "one of the worst losses that anyone can experience" and that the De La Lastras will never get over the loss of their children. He further testified that Gonzalo was undergoing psychiatric care, and needs five to six years of additional treatment to cope with his grief, even though he experienced no emotional disturbances prior to his sons' deaths. His depression is demonstrated by his mood, which is exhibited in flat affection, despondence, crying, sleeplessness, and extreme sadness. Although Gonzalo has elected to undergo treatment for his bereavement, Amanda has not. Evidence at trial showed that she is almost nonfunctional, very withdrawn, rarely leaves her home, and in fact did not attend the trial of this case because of her grief.

▪ A parent's recovery under the wrongful death statute includes the loss of companionship and society and damages for mental anguish suffered as a result of the child's wrongful death. *Sanchez v. Schindler*, 651 S.W.2d 249, 253 (Tex.1983). The destruction of the parent-child relationship results in mental anguish, and it would be unrealistic to separate injury to the familial relationship from emotional injury. *Id.* "The real loss sustained by the parent ... is the loss of love, advice, comfort, companionship, and society." *Id.* at 251. In view of the testimony at trial, we conclude that the evidence was sufficient to support the jury's finding. Appellant's tenth point is overruled, and the judgment is in all things affirmed.

## OPINION ON MOTION
## FOR REHEARING

On rehearing, appellant asks us to address an issue which was not brought up in either its brief, reply brief, or oral argument. Such issue involves the relevance of two cases, *Miles v. Apex Marine Corp.*, — U.S. ——, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), and *Texaco Refining & Marketing Inc. v. Estate of Dau Van Tran*, 808 S.W.2d 61 (Tex.1991). *Miles* was decided in November 1990, prior to submission of this case,[1] and held that recovery for non-pecuniary loss is excluded under general maritime claims for wrongful death, the Jones Act, and the Death on the High Seas Act. In *Miles*, the plaintiff, the administratrix of the deceased seaman's estate, sued a vessel's operators, alleging negligence under the Jones Act and breach of the warranty of seaworthiness under general maritime law.

In *Dau Van Tran*, which was decided approximately one month after oral argument in this case, the Texas Supreme Court held that where applicable and properly invoked, general maritime law preempts state causes of action and remedies. In that case, the decedent was crushed to death when a large wave, purportedly caused by a Texaco tanker's excessive speed, washed ashore just as he exited the water between a dock barge and a shrimp boat. The decedent's estate sued Texaco under the Texas Wrongful Death and Survivorship Statutes. The Texas Supreme Court stated that general maritime jurisdiction was appropriate under the Admiralty Extension Act of 1948, 46 U.S.C.A.App. § 740: "[t]he admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, *caused by a vessel on navigable water*, notwithstanding that such damage or injury be done or consummated on land." *Dau Van Tran*, 808 S.W.2d at 63. The court stated that where *properly invoked by pleadings and litigated at trial*, a trial court's failure to award damages consistent with maritime law constitutes reversible error (emphasis added). In that case, Texaco raised maritime law in its fourteenth proposed find-

ings of fact and conclusions of law, and in its motion for new trial. Moreover, during oral argument, the parties conceded that a maritime tort had occurred. By contrast, in the instant case, the parties tried the entire case on state law principles of negligence and strict product liability. General Chemical even submitted its own issues based on Texas law regarding loss of companionship, conscious pain and suffering, and exemplary damages. No objection was made to any of the proposed jury questions on the basis that general maritime law governed. This issue was not raised in General Chemical's motion for new trial. The parties never conceded that a maritime tort had occurred. Paradoxically, in a responsive motion before this court, General Chemical stated:

[t]he judgment against appellant herein is not under the Jones Act but rather under common law and statutory law of the State of Texas. Appellant is not appealing any claim under the Jones Act but rather a claim under the Texas common law of negligence and strict product liability. The Jones Act ... has the purpose of allowing seamen injured in the course of employment or their representatives to maintain action in federal court without requiring diversity of citizenship [citations omitted] It is for the benefit of seamen against their employers. [citations omitted] ... Here the suit against the employer and shipowner, Gayman Prawns, Inc., the only possible Jones Act claim, was severed and made the subject of a separate action.

Accordingly, we conclude that appellant, General Chemical, waived any preemption argument and accordingly we need not address the merits of the applicability of *Miles* and *Texaco*. In addition, we agree that the case was one of negligence and strict product liability and was not a maritime law case. Appellant's motion for rehearing is overruled.

---

1. This case was submitted in March 1991.