Rodolfo **GUTIERREZ** and Estella V. Gutierrez, as Surviving Parents of Roel Alejandro Gutierrez, Plaintiffs-Appellees,

v.

**EXXON CORPORATION,**
Defendant-Appellant.

No. 84–2745
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

July 1, 1985.

Rehearing Denied Aug. 2, 1985.

---

Crain, Caton, James & Womble, Chris A. Lorenzen, Houston, Tex., for defendant-appellant.

Dicky Grigg, Paul E. Knisely, Austin, Tex., Ramon Garcia, Edinburg, Tex., for plaintiffs-appellees.

Before REAVLEY, POLITZ and HIGGINBOTHAM, Circuit Judges.

POLITZ, Circuit Judge:

We are asked to review a jury's verdict and award in this diversity wrongful death action brought under Tex.Rev.Civ.Stat. Ann. art. 4671. Finding no basis to reject the jury's determination or the trial court's denial of defendant's motion for judgment n.o.v., we affirm.

## Facts and Background

Roel Gutierrez died of injuries sustained while working as a member of a crew performing a "cut and cap" operation on an abandoned Exxon oil well. Gutierrez was employed by Johnson Tool Company which had been hired by Exxon to cut and cap a well abandoned as a non-producer in 1964. In August 1982 the landowner asked Exxon to restore and return his land. Johnson Tool had contracted with Exxon to perform services of this type for over 30 years.

The well piping consisted of an inner casing, an outer casing, and a casing head. The inner casing had a diameter of 7⅝ inches and extended to a depth of 9,744 feet. The outer casing, which supported the inner casing, was 10¾ inches wide and ran to a depth of 2,557 feet. The inner casing rested on slips that attached to the 700-pound casing head and to the top of the outer casing. The weight of the inner casing exerted a downward pressure of approximately 360,000 pounds on the outer casing.

In a typical cut and cap undertaking a trench is dug around the well pipe, a cutting torch is used to sever the inner and outer casing about three feet below ground level, a cap is welded in place over the top of the pipe, and the hole is then covered with dirt. Thereafter only the pipe in place below ground and memories remain of the well. The cutting of the casings is the most dangerous part of the job. Typically "windows" are cut in the outer casing allowing access to the inner casing. The inner casing is then severed and will usually fall down-hole. At that point the remainder of the outer casing is cut and it and the casing head are lifted out of the hole.

Johnson Tool had used this window technique to cut and cap over 200 wells for Exxon, all without incident. But on August 27, 1982 Roel Gutierrez met with disaster. He first cut the windows in the outer casing and was in the process of torching the inner casing when the outer casing buckled and the casing head fell on him, inflicting fatal crushing injuries.

After trial on the merits the jury found Exxon negligent for failing to warn Johnson Tool's employees of a dangerous condition which posed an unreasonable risk of harm. The jury found that Exxon knew that when windows were cut in the outer casing it would not be strong enough to support the tremendous weight applied by the inner casing and would buckle and collapse. Finding Exxon's negligence a legal cause of the death, the jury awarded Gutierrez's parents a total of $1,200,000, apportioned $150,000 for loss of support, $50,000 for loss of services, $250,000 for loss of companionship, and $750,000 for mental anguish and emotional distress. Exxon timely appealed contending that it owed no duty to decedent, that the verdict was not supported by the evidence, that the court erred in failing to submit a requested special interrogatory on the source of the danger, and that the damages awarded are excessive.

## Analysis

### Liability

Exxon maintains that it should not have been held liable for this accident because, as a matter of law, it owed no duty to the employees of the independent contractor. Exxon correctly notes that one who engages an independent contractor is not obligated to protect the contractor's employees from hazards which are incidental to or part of the work the independent contractor is hired to perform. *See, e.g., Shell Chemical Company v. Lamb*, 493 S.W.2d 742 (Tex.1973), and *Jenkins v. Fritzler Development Corp.*, 580 S.W.2d 63 (Tex.Civ.App.—Houston [1st Dist.] 1979, *writ ref'd n.r.e.*). However, Exxon owed a duty to the employees of Johnson Tool to

use reasonable care to inspect its premises for dangerous conditions and to keep its premises reasonably safe. *Shell Chemical Company*, 493 S.W.2d at 746. This included a duty to warn an independent contractor of any dangerous condition which was not open and obvious. *Id.* at 746–47. Otherwise stated, Exxon owed a duty to Johnson Tool to warn of any dangerous condition Exxon knew or should have known existed if the condition was not reasonably apparent to Johnson Tool's employees. *Sun Oil Co. v. Massey*, 594 S.W.2d 125 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.).

■ That the abandoned well posed no danger until after the independent contractor began its work does not end the legal inquiry. Johnson Tool was invited to the premises for the purpose of cutting and capping the well. The record contains evidence that Exxon knew that the cutting procedure to be employed by Johnson Tool was not safe on this particular well because of the 360,000-pound pressure on the outer casing. The evidence reflects that this information was in the possession of Exxon's engineers but was not made known to Johnson Tool. The evidence also reflects that the employees of Johnson Tool did not know that the procedure they were using was dangerous, nor could they reasonably have learned of the danger from the information provided.

The jury answered special interrogatories, finding that Exxon negligently failed to warn Johnson Tool of a dangerous condition posing an unreasonable risk of harm. The record contains evidence of such quality and weight that reasonable and fairminded jurors, in the exercise of impartial judgment, might conclude that Exxon was actionably negligent. *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc). We shall not disturb their determination.

### Jury Interrogatory

■ Exxon contends that the judge erred in declining to pose to the jury an interrogatory concerning whether the danger which caused Gutierrez's death "arose out of or was inherent in the work Johnson Tool Company was hired to do." There was no error in the refusal of this special interrogatory. The court charged the jury that if it found "that the accident was inherent in and arose from the performance of the work of Johnson Tool Company" Exxon was not legally responsible for the death. The special interrogatory would have added naught in this setting.

### Damages

■ Appellate review of a jury's assessment of damages is very limited. It is only when an award exceeds the bounds of any reasonable recovery that our maximum recovery rule comes into play and remittitur is triggered. *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778 (5th Cir.1983). A remittitur is rarely ordered.

> We do not reverse a jury verdict for excessiveness except on "the strongest of showings." The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. We have expressed the extent of a distortion that warrants intervention by requiring such awards to be so large as to "shock the judicial conscience," "so gross or inordinantly large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount that *any* reasonable man could feel the claimant is entitled to." (footnote citations omitted)

*Id.* at 784.

■ Exxon argues that the $150,000 award for loss of support is manifestly excessive because such an amount, if invested at a rate of 10% per annum, would yield interest income in an amount greater than Gutierrez's $11,000 annual income. The argument is not persuasive and no dispositive authority for this proposition is cited, nor have we found any. It is apparent that the jury made a diligent effort to fix the damages at the loss reasonably believed to be sustained by the parents. An economist testified that during the balance of Mrs. Gutierrez's life her son would

have accumulated approximately $356,000 in discretionary income from which he could have made contributions to his parents. During deliberations the jury inquired about information which the economist had written on an easel but that writing was withheld because it was not in evidence. In addition to the testimony of the economist, the evidence contained testimony that the decedent routinely gave his parents one-half of his earnings. The $150,000 award is not excessive as a matter of law. "These damages are not susceptible of exact proof and the amount is left largely to the sound discretion and common sense of the jury." *General Motors Corp. v. Grizzle,* 642 S.W.2d 837, 845 (Tex.App.—Waco 1982, *writ dism'd*).

Exxon next argues that the $250,000 award for loss of society and companionship, and $750,000 for mental anguish and distress are clearly excessive. Our research discloses that this is the largest published award for the surviving parents of an adult child.[1] But this level of recovery has been awarded to parents of a minor child. *Gulf States Utilities Co. v. Reed,* 659 S.W.2d 849 (Tex.App.—Houston [14th Dist.] 1983, *writ ref'd n.r.e.*). In *Gulf States* the surviving parents of a 13-year-old boy were awarded $500,000 for loss of society and $500,000 for mental anguish. Exxon argues that the evidence of mental anguish is not as strong in this case as it was in *Gulf States.* Granted, unlike this case the decedent in *Gulf States* was an only child. And unlike Mrs. Gutierrez, the mother in *Gulf States* was admitted to a hospital for approximately five months, suffered severe weight loss, and was

placed on anti-depressant drugs indefinitely. But there was evidence that Mr. and Mrs. Gutierrez were suffering from a particularly severe depressive reaction that lasted an unusually long time. We are very reluctant to substitute our views on damages for those of the jury for, after all, they have "seen the parties and heard the evidence; we have only read papers." *Caldarera,* 705 F.2d at 783. We decline to invoke the maximum recovery rule where, as here, the amount is not disproportionate to at least one similar Texas case.[2]

The verdict and judgment are AFFIRMED.

---

1. Historically, Texas did not permit surviving parents to recover for mental anguish, grief, bereavement, or loss of companionship for the death of a child. *Bedgood v. Madalin,* 600 S.W.2d 773 (Tex.1980). This rule was only recently changed. *Sanchez v. Schindler,* 651 S.W.2d 249 (Tex.1983) (involving a minor child). The right of recovery now extends to the surviving parents of adult children. *City of Houston v. Stoddard,* 675 S.W.2d 280 (Tex.App. —Houston [1st Dist] 1984, *writ ref'd n.r.e.*). *But see, Piper Aircraft Corp. v. Yowell,* 674 S.W.2d 447, 462 (Tex.App.—Fort Worth 1984, *writ granted*) (Surviving parents of adult child may

not recover for loss of society and companionship. The case is now pending in the Texas Supreme Court, No. C–3405).

2. In *Haley v. Pan American World Airways,* 746 F.2d 311 (5th Cir.1984), the surviving parents were awarded $350,000 each for the loss of the love and companionship of their adult child. At that time $150,000 was the highest wrongful death recovery on record for a parent in Louisiana. We ordered a remittitur to $200,000 or a new trial. 746 F.2d at 318–19.