In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-287 CV


____________________



WILLIAM N. HAWKINS AND ALEX STRANGE, Appellants



V.



VIVIAN WALKER AND BAPTIST HOSPITALS OF


SOUTHEAST TEXAS d/b/a MEMORIAL HERMANN BAPTIST


HOSPITAL EAST, Appellees






On Appeal from the 60th District Court


Jefferson County, Texas


Trial Cause No. A-167,869 consolidated with D-169841






OPINION


 In this wrongful death case, we consider whether the evidence is legally and factually
sufficient to support the jury's award of $1,700,000 in damages to Vivian Walker for past
and future mental anguish and for past and future loss of companionship and society arising
from the death of her twenty-six year old daughter, Shiketa Walker. See Tex. Civ. Prac. &
Rem. Code Ann. §§ 71.001-71.012 (Vernon 1997 & Supp. 2006). Among other issues, we
review the legal and factual sufficiency of the jury's damage award to Vivian. We also
consider whether the jury's award of $7,000 wrongful death damages to Alex Strange,
Shiketa's father, is against the greater weight and preponderance of the evidence.

 We conclude that the evidence is legally sufficient, but factually insufficient, to
support the jury's damage award to Vivian. As a result, we reverse and remand the judgment
entered in Vivian's favor for a new trial. We further conclude that the jury's award to Alex
is not against the greater weight and preponderance of the evidence, and affirm the judgment
regarding his claims. 

I. Procedural Background


 The claims in this case arise from the January 28, 2002, death of Shiketa Walker. 
Shiketa's parents, Vivian Walker and Alex Strange, filed a medical malpractice lawsuit in
which they allege that the negligence of Memorial Hermann Baptist Hospital (MHBH), Dr.
William N. Hawkins, and Dr. Steven L. Kastl caused Shiketa's death. The parents' claims
further arise from Shiketa's treatment at separate healthcare facilities on separate dates. 

 Dr. Kastl settled the claims against him prior to jury selection. The parties tried the
case to a jury in December 2005. The jury found both Dr. Hawkins and Dr. Kastl negligent
and found their negligence proximately caused Shiketa's death. The jury further found that
MHBH was not negligent. The jury apportioned fault between the two doctors, allocating
sixty percent of the fault to Dr. Kastl and forty percent of the fault to Dr. Hawkins. 

 The jury also answered issues concerning the parents' damages. It awarded Vivian 
damages of $500,000 for past loss of companionship and society, $500,000 for future loss
of companionship and society, $500,000 for past mental anguish, $200,000 for future mental
anguish, and $5,000 in funeral and burial expenses. The jury awarded Alex no damages for
past loss of companionship and society, $3,500 for future loss of companionship and society,
$3,500 for past mental anguish, and nothing for future mental anguish. Based on the jury's
apportionment of fault, the trial court's judgment awarded Shiketa's mother, Vivian,
$812,298.00 against Dr. Hawkins. (1) After the trial court credited Dr. Hawkins with the
settlement proceeds that Alex received from his settlement with Dr. Kastl, it awarded Alex
no additional damages. Dr. Hawkins and Alex appeal from the trial court's judgment.

II. Factual Background


 On Friday, January 25, 2002, Shiketa was treated at MHBH by Julie Jeanes, an
obstetrical nurse. According to Nurse Jeanes, Shiketa said she was pregnant and reported
that she had been bleeding and passing clots for two weeks. Nurse Jeanes testified that she
"paged" Dr. Hawkins, who she understood was "on-call" for Shiketa's regular physician, Dr.
Barry. Nurse Jeanes testified that Dr. Hawkins returned her call at 3:00 p.m. Vivian
introduced Shiketa's medical records from Baptist containing Nurse Jeanes's notes, which
are consistent with her testimony that she "paged" Dr. Hawkins and that he returned her call. 


 According to Nurse Jeanes, Dr. Hawkins ordered an ultrasound and told her to
discharge Shiketa and tell her to see her regular physician on Monday if the ultrasound did
not show she had a baby in her uterus. Subsequently, Shiketa's ultrasound showed no
significant abnormality, and at 4:30 p.m. MHBH discharged Shiketa from its care after
advising her to follow up with Dr. Barry. Shiketa was not examined by Dr. Hawkins or any
other physician on January 25 prior to being discharged from MHBH.

 On Sunday, January 27, 2002, Shiketa sought treatment at St. Elizabeth Hospital and
saw Dr. Kastl. At that point, she complained of abdominal pain. Following a positive
pregnancy test and his examination, Dr. Kastl diagnosed Shiketa as suffering from
constipation and discharged her. On Monday, January 28, 2002, Shiketa died at home from
a ruptured tubal ectopic pregnancy. Shiketa was twenty-six years old when she died. 

 The principal dispute at trial concerned whether Nurse Jeanes spoke to Dr. Hawkins
on January 25. Dr. Hawkins testified that he was not on call for Dr. Barry on January 25
prior to 5:00 p.m. Dr. Hawkins disputed that he spoke to Nurse Jeanes regarding Shiketa's
treatment at MHBH and testified that Nurse Jeanes was confused about whether she spoke
to him. Dr. Hawkins specifically denied that he was on call for Dr. Barry around 3:00 p.m.
when Nurse Jeanes testified that she spoke to him. By its verdict, the jury rejected Dr.
Hawkins's contention that he was not involved in Shiketa's care, found him negligent, and
awarded wrongful death damages to Shiketa's parents, Alex and Vivian. No party requested
that the trial court submit any damages issues for Shiketa's estate under the Texas Survival
Statute. See Tex. Civ. Prac. & Rem. Code Ann. § 71.021 (Vernon 1997). Therefore, the
jury's damage award to the parents is based solely on the Wrongful Death Statute. See Tex.
Civ. Prac. & Rem. Code Ann. § 71.004 (Vernon 1997). 

 Dr. Hawkins asserts the evidence is legally and factually insufficient to support the
judgment against him. We consider his factual sufficiency challenges in section IV. 

III. Legal Sufficiency of Evidence


 As a part of his arguments in issues two, three, and four, Dr. Hawkins attacks the legal
sufficiency of the evidence supporting the jury's findings on negligence, causation, and
damages. We consider his arguments on negligence and causation first.

 A. Negligence and Causation

 In issues two and three, Dr. Hawkins asserts that the evidence is legally insufficient
to support the jury's findings against him on negligence and causation. He contends the
evidence is legally insufficient because Shiketa was treated and discharged by Dr. Kastl just
one day before her death, and that during her earlier treatment at MHBH Shiketa lacked
abdominal pain, a key symptom of an ectopic pregnancy. Dr. Hawkins asserts that while
Shiketa gave no history of abdominal pain to Nurse Jeanes at MHBH, Shiketa complained
of abdominal pain during her later visit with Dr. Kastl. Dr. Hawkins argues that Dr. Kastl's
negligence in failing to diagnose Shiketa's ectopic pregnancy was a "new and independent
cause" of her death and concludes that Dr. Kastl's negligence was the sole cause of Shiketa's
death. 

 When analyzing a legal sufficiency claim, we view the evidence in the light most
favorable to Vivian, the prevailing party, crediting favorable evidence if reasonable jurors
could and disregarding contrary evidence unless reasonable jurors could not. See City of
Keller v. Wilson, 168 S.W.3d 802, 807 (Tex. 2005). The evidence is legally sufficient if it
enables "reasonable and fair-minded people to reach the verdict under review." Id. at 827.

To prevail on her claims against Dr. Hawkins, Vivian was required to prove that: (1) a
physician and patient relationship existed, (2) Dr. Hawkins had a duty to comply with a
specific standard of care, (3) Dr. Hawkins breached that standard of care, (4) Shiketa was
injured, (5) a causal connection existed between the breach of the standard of care and the
injury, and (6) damages occurred. See Tex. Civ. Prac. & Rem. Code Ann. § 74.001(13)
(Vernon 2005) (including a cause of action against a physician within definition of "health
care liability claim"); Day v. Harkins & Munoz, 961 S.W.2d 278, 280 (Tex. App.-Houston
[1st Dist.] 1997, no writ) (stating generally that physician malpractice claims require
elements two through five above); Fought v. Solce, 821 S.W.2d 218, 220 (Tex. App.-
Houston [1st Dist.] 1991, writ denied) (requiring proof of doctor-patient relationship); see
also IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex.
2004) (generally analyzing proximate causation in claims against health care providers).

 Dr. Hawkins maintains he was not negligent because Shiketa, a patient with an ectopic
pregnancy, did not complain of abdominal pain. However, Dr. Hawkins's trial testimony
contradicts his argument on appeal. Dr. Hawkins testified that on January 25, Shiketa
presented with sufficient symptoms to require her physician to rule out the possibility of an
ectopic pregnancy. Dr. Hawkins also acknowledged that patients with ectopic pregnancies
do not always complain of abdominal pain. 

 Based on the record before us, it appears that a history of abdominal pain, although
often a symptom of an ectopic pregnancy, is not a precondition for it. Further, Dr. Hawkins
testified that based on Shiketa's symptoms, her physician should have assumed the worst,
acted upon it, and then treated the patient to the point that the physician could "prove it
otherwise." Dr. Hawkins testified that this process was not followed by Shiketa's health care
providers. The record also contains expert testimony from other physicians that Dr.
Hawkins's medical treatment breached the applicable standard of care. As a result, we find
sufficient evidence in the record to conclude that reasonable and fair-minded people could
agree with the jury's resolution of the negligence issue. 

 Dr. Hawkins also asserts the evidence is legally insufficient on causation. In order to
prove causation in a medical malpractice case, Shiketa's parents had the burden to establish
a "reasonable medical probability" that the acts or omissions of the defendants proximately
caused Shiketa's death. See Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex.
1995); Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988).

 The record contains testimony addressing causation. At trial, Dr. Hawkins agreed that
had Shiketa been diagnosed with an ectopic pregnancy on January 25, she would not have
bled to death on January 28. One of the plaintiffs' experts was Dr. Ira Mickelson, a
physician who is board certified in obstetrics and gynecology. Dr. Mickelson testified that
if an ectopic pregnancy had been diagnosed on January 25 or January 27, Shiketa would have
survived. Dr. Mickelson specifically testified that "had [Shiketa] gotten the proper care that
she should have on that date [January 25] she would not have died." Plaintiffs' other expert,
Dr. Joseph Des Rosiers, also board certified in obstetrics and gynecology, testified that Dr.
Hawkins's negligence on January 25 caused Shiketa's death three days later on January 28. 
Dr. Hawkins's expert witness, Dr. Christopher Dowdy, agreed during his cross-examination
that Shiketa would not have died on January 28 if Dr. Hawkins had discovered the fetus in
Shiketa's fallopian tube on January 25. 

 On appeal, Dr. Hawkins argues that his earlier failure to discover the ectopic
pregnancy was not a proximate cause of the death because Dr. Kastl treated Shiketa on the
day prior to her death and had an opportunity then to discover the problem. Further, Dr.
Hawkins argues that he was not negligent because Shiketa did not have one of the primary
signs of an ectopic pregnancy, abdominal pain, when she was at MHBH, but she had that
sign when she saw Dr. Kastl. Dr. Hawkins suggests that under these circumstances, Dr.
Kastl's negligence was a new and independent cause, and the sole cause of Shiketa's death. 
 "A new and independent cause is one that intervenes between the original wrong and
the final injury such that the injury is attributed to the new cause rather than the first and
more remote cause." Dew v. Crown Derrick Erectors, Inc., 208 S.W.3d 448, 450 (Tex.
2006). The intervening cause relieves the original wrongdoer of liability for negligence
because the intervening negligence destroys "the causal connection between [the original] 
negligence and the plaintiff's injury[.]" Id. In the case before us, the trial court instructed
the jury on this inferential rebuttal defense.

 To determine whether an act is a concurring or a new and independent cause, the
"threshold, and often controlling, inquiry when distinguishing between a concurring and a
superseding cause remains 'whether the intervening cause and its probable consequences
were such as could reasonably have been anticipated by the original wrongdoer.'" Id. at 452
(citing Bell v. Campbell, 434 S.W.2d 117, 120 (Tex. 1968)). Thus, in this case, we evaluate
whether a subsequent event constitutes a new and independent cause by considering the risk
of the original omission. See id. at 453. In this case, the risk of the original omission was
that Shiketa's ectopic pregnancy would rupture resulting in her injury or death. "Where the
intervening act's risk is the very same risk that renders the original actor negligent, the
intervening act cannot serve as a superseding cause." Id. 

 We conclude that the record does not support Dr. Hawkins's argument that Dr. Kastl's
failure to diagnose Shiketa's ectopic pregnancy constitutes a superseding cause of her death. 
Dr. Kastl's own failure to diagnose Shiketa's ectopic pregnancy did not alter the foreseeable
consequences of Dr. Hawkins's failure to diagnose it. The intervening act, that a doctor did
not accurately diagnose Shiketa's condition, thus allowing the ectopic pregnancy to rupture,
is the same risk that renders Dr. Hawkins negligent. Under the circumstances here, we
conclude that the jury properly could have considered Dr. Kastl's omission a concurring
rather than an intervening cause of Shiketa's death.

 With respect to Dr. Hawkins's argument that Dr. Kastl could have prevented 
Shiketa's death, the contention that another person has the "last clear chance" to save a
victim from injury is subsumed in the trial court's comparative negligence submission. See
French v. Grigsby, 571 S.W.2d 867, 867 (Tex. 1978) (disapproving a last-clear-chance issue
in favor of comparative negligence submission); Columbia Rio Grande Reg'l Healthcare,
L.P. v. Hawley, 188 S.W.3d 838, 860 (Tex. App.-Corpus Christi, 2006, pet. filed) (stating
that "negligence of a third party does not necessarily create a new and independent cause"). 
By its apportionment of fault, partially to Dr. Kastl and partially to Dr. Hawkins, the jury
resolved the argument over whose negligence caused Shiketa's death. In summary, the
record does not conclusively establish that Dr. Kastl's failure to diagnose Shiketa's ectopic
pregnancy was the sole cause, or a new and independent cause, of Shiketa's death. 

 We conclude that reasonable and fair-minded jurors could have determined that Dr. 
Hawkins was negligent and that his negligence proximately caused Shiketa's death. Thus,
we overrule Dr. Hawkins's argument that the evidence is legally insufficient to support the
jury's verdict on negligence and causation.

 B. Damages Awarded To Vivian Walker

 In issue four, Dr. Hawkins also challenges the legal sufficiency of the evidence
supporting the jury's damages award to Shiketa's mother. The jury awarded Vivian
$1,000,000 for past and future loss of companionship, $700,000 for past and future mental
anguish, and $5,000 for funeral and burial expenses. Dr. Hawkins does not challenge the
jury's award for funeral and burial expenses. However, he does challenge the award of $1.7
million in non-pecuniary damages.

 Dr. Hawkins argues that the jury's award is excessive because the evidence showed
that Shiketa moved out of Vivian's home in the ninth grade, Vivian did not know that Shiketa
was pregnant, and Vivian did not accompany Shiketa to the hospital on January 25 or January
27. Dr. Hawkins concludes that these facts show a strained relationship between Shiketa
and her mother.

 We review the legal sufficiency of evidence supporting a damage award under the
Keller standard. See 168 S.W.3d at 807. The testimony at the trial shows that Vivian and
Shiketa resided together until Shiketa failed to complete the ninth grade, after which they
lived apart, although in the same community. After Shiketa moved out, Vivian had regular,
if not daily, contact with Shiketa, either in person or by telephone. Vivian and Shiketa ate
together several times a week. There is also testimony that Vivian reacted with anguish when
informed of Shiketa's death. 

 We consider this evidence in the light most favorable to Vivian while crediting
favorable evidence if reasonable jurors could and disregarding contrary evidence unless
reasonable jurors could not. See id. We find the supporting evidence would enable
"reasonable and fair-minded people to reach the verdict" awarding damages for Vivian's past
and future mental anguish and loss of companionship. See id. Thus, we find the evidence
is legally sufficient to support the trial court's submission of issues of mental anguish and
loss of companionship and society, and we overrule Dr. Hawkins's legal sufficiency
argument in issue four as it relates to the damages awarded to Vivian Walker.

IV. Factual Sufficiency of the Evidence: Damage Award To Vivian Walker


 Also in issue four, Dr. Hawkins contends the evidence is factually insufficient to
support the damage award to Vivian. We agree.


 A. Evidence

 The record reflects that Vivian was the only witness who testified regarding the effect
of Shiketa's death on her. Vivian's entire testimony consisted of thirty-six pages from a ten
volume trial transcript, and thus, amounted to only a small part of the evidence presented to
the jury.

 Vivian was forty-eight years of age at the time of trial and married to Robert Sells,
with whom she had lived for over twenty years. Vivian has two other children, a son and
daughter, who were also adults at the time of the trial. When the case was tried, Vivian was
taking care of her youngest daughter's four-year-old son.

 Vivian testified that she dropped out of high school, and then became pregnant with
Shiketa, who was born in 1975. Vivian and Alex, Shiketa's father, lived with Vivian's
mother for a year before the couple moved to a rent house. Alex lived with Vivian for about
four months, but they continued to have an on-and-off relationship that resulted in their
having another child. After their second child was born, Vivian lived with Alex
approximately eight months and then ended her relationship with him. Vivian further
testified that she supported her family by working in the food service department of a
hospital when her children were young.

 At the time of her death, Shiketa had not lived with Vivian for a number of years.
After failing to complete the ninth grade, Shiketa dropped out of school. At that point,
Shiketa moved out of Vivian's home, and for the next two years Shiketa lived with relatives. 
Later, Shiketa primarily lived in apartments that Vivian furnished.

 During the last few years of Shiketa's life, she and Vivian saw each other several
times a week and talked frequently on the phone. During this period, Vivian often cooked
for Shiketa or gave her money for meals. With respect to their relationship, Vivian testified
that Shiketa enjoyed coming to her house and that Shiketa liked her cooking. Vivian's
testimony reflects that occasionally she took Shiketa to stores, bought groceries for her, paid
her bills, and took her to the doctor. However, there is little evidence that Shiketa and Vivian
shared other activities or common interests.

 During the last few days of Shiketa's life, Vivian had telephone contact with Shiketa
regarding her health problems. Vivian related that she spoke to Shiketa several times by
phone between January 25 and 27. Vivian testified that she talked to Shiketa while she was
at MHBH; Shiketa said that she felt okay and was about to be released. Vivian offered to
pick Shiketa up at MHBH, but Shiketa declined, as she had already arranged for a ride. In
the early morning hours of January 26, Vivan testified that Shiketa called and said she was
at a friend's house. Vivian knew the first name of Shiketa's friend but not his last name. 
Vivian also acknowledged that because Shiketa lived independently, there were a lot of
things about Shiketa that she did not know.

 Vivian testified that Shiketa called her from St. Elizabeth Hospital on January 27
while waiting to see the doctor. Later, Shiketa called to tell Vivian about her pregnancy. 
Shiketa also said that St. Elizabeth was about to release her, and Vivian arranged for her
husband to meet Shiketa at St. Elizabeth and take her home. In order to make arrangements
to deliver a meal to Shiketa, Vivian called Shiketa after she returned to her apartment. This
was Vivian's last conversation with Shiketa.

 On the afternoon of January 28 while Vivian was at work, Vivian's mother called to
inform her that Shiketa had been found dead in her apartment. Vivian testified that she
dropped the phone, walked into her supervisor's office, began screaming, and could not stop. 
Vivian testified that she could not believe she would never see Shiketa again.

 Vivian's only additional testimony addressing the effect of Shiketa's death was as
follows:

 I loved my daughter very much, and I miss my daughter. And I just
don't think that this is right. I think about Shiketa every day. I go to the
cemetery once a month. I put flowers on her grave. I just - it's just - I just
can't believe this. I can't believe this happened. . . . It makes me feel bad
[that Shiketa's health providers could have done something]. It makes me feel
bad because she just slipped through my fingers, and they didn't even care. 
They just let her die, and they want to blame me. 


 Through answers to questions contained in the court's charge, the jury determined the
damages to Vivian for her past and future loss of companionship and society, and for her past
and future mental anguish. The jury instructions defined loss of companionship and society
to mean "the loss of the positive benefits flowing from the love, comfort, companionship,
and society that Vivian Walker, in reasonable probability, would have received from Shiketa
Walker, had she lived." The instructions also defined mental anguish as "the emotional pain,
torment, and suffering experienced by Vivian Walker because of the death of Shiketa
Walker." The trial court further instructed the jury that it could consider Vivian and
Shiketa's relationship, their living arrangements, any extended absences from one another,
the harmony of their family relations, and their common interests and activities. See Moore
v. Lillebo, 722 S.W.2d 683, 688 (Tex. 1986) (describing these as appropriate elements for
jury's consideration in wrongful death cases). The jury awarded $1.7 million for Vivian's
mental anguish and loss of society and companionship due to Shiketa's death.

 B. Analysis

 Personal injury damage awards are "unliquidated and are not capable of certain
measurement; [thus,] the jury has broad discretion in assessing the amount of damages in a
personal injury case." Missouri Pac. R.R. Co. v. Roberson, 25 S.W.3d 251, 257 (Tex. App.
-Beaumont 2000, no pet.). Yet, at the same time, a factual sufficiency review insures that
the evidence supports the jury's award; and, although difficult, the law requires appellate
courts to conduct factual sufficiency reviews on damage awards in personal injury cases.
Saenz v. Fidelity & Guar. Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996). Thus, while
a jury has latitude in assessing intangible damages in personal injury cases, a jury's damage
award does not escape the scrutiny of appellate review. See id. In Saenz, the Texas Supreme
Court stated:

While the impossibility of any exact evaluation of mental anguish requires
that juries be given a measure of discretion in finding damages, that discretion
is limited. Juries cannot simply pick a number and put it in the blank. They
must find an amount that, in the standard language of the jury charge, "would
fairly and reasonably compensate" for the loss.


Id. (quoting Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995)).

 Whether factually sufficient evidence supports the damages awarded by the jury to
Vivian for her mental anguish and loss of companionship and society is a difficult question. 
A court that reduces a jury's damage award faces criticism that it is not sympathetic to the
loss suffered by the survivors. On the other hand, jury verdicts perceived as being excessive
result in legislative efforts to cap the amounts that can be awarded in judgments, regardless
of the damage suffered by the victim. See, e.g., Tex. Civ. Prac. & Rem. Code Ann. §
41.008 (Vernon Supp. 2006) (limiting amount that may be awarded in exemplary damages
in certain types of cases); Tex. Civ. Prac. & Rem. Code Ann. §§ 74.301-74.303 (Vernon
2005) (limiting damages in health care liability claims cases).

 The remedy that allows a parent to recover non-pecuniary damages for the death of
a child is a relatively recent one. Prior to 1983, the courts imposed a pecuniary-loss rule that
constrained a parent's recovery for the death of a minor child. See Sanchez v. Schindler, 651
S.W.2d 249, 251(Tex. 1983) ("In the past a surviving parent's damages in an action for the
death of a child under the Texas Wrongful Death Act have been limited to the pecuniary
value of the child's services and financial contributions, minus the cost of his care, support
and education."). In 1986, the Texas Supreme Court clarified that the parents of an adult-child decedent could recover their loss of society damages. Yowell v. Piper Aircraft Corp.,
703 S.W.2d 630, 635-36 (Tex. 1986). That same year, the Texas Supreme Court reversed
a Fort Worth Court of Appeals opinion that had denied parents loss of society damages
awarded by a jury for the death of an adult child. See Moore, 722 S.W.2d at 683 (reversing
for trial court's refusal to submit damage issues requested by parents of an adult child). 
Regarding the proof required to sustain the parent's award of non-pecuniary damages, the
Texas Supreme Court stated that the survivors need not prove that they suffered a physical
manifestation of mental anguish in order to sustain a verdict awarding mental anguish
damages. Id. at 685.

 When it discarded the pecuniary loss rule for child-death cases, our Supreme Court
reasoned that our "judicial system has adequate safeguards to prevent recovery of damages
based on sympathy or prejudice rather than fair and just compensation for the plaintiff's
injuries." Sanchez, 651 S.W.2d at 253. One of those safeguards is a factual sufficiency
review by a court of appeals.

 While the testimony at trial showed that Shiketa and Vivian had a loving relationship,
there is no testimony that Vivian was dependent on Shiketa or that Vivian continued to suffer
a severe grief reaction after her initial shock from learning of Shiketa's death. There is no
evidence that Vivian suffered from depression, that she required any medical treatment to
cope with Shiketa's death, that she could no longer work as a result of Shiketa's death, or
that Shiketa's death significantly interfered with any of Vivian's daily activities. For
instance, there was no testimony that Vivian missed any work or changed her daily activity
as a result of Shiketa's death. There is little evidence that Shiketa and Vivian had significant
common interests or activities. There is no testimony from Vivian's current spouse, her other
children, close friends, or members of the clergy about any adverse effect on Vivian's
physical or emotional status resulting from Shiketa's death. There is no testimony that
Vivian was financially dependent on Shiketa or that she relied upon Shiketa for any advice
or household services.

 We have located only one case in which a Texas appellate court affirmed a jury award
of more than $300,000 for a parent when the evidence did not include testimony consistent
with the conclusion that the parent suffered severe mental anguish or severe grief because
of the child's death. In Russell v. Ramirez, the Fourteenth Court of Appeals specifically
declined to require medical testimony to support a severe mental anguish award of $750,000,
and relied in part upon the Supreme Court's statement in Moore that the "assessment of the
resulting grief is a task for which juries have traditionally been considered well-suited, and
in which they can be properly expected to draw upon their own experience and empathy." 
Russell v. Ramirez, 949 S.W.2d 480, 487 n.1(Tex. App. - Houston [14th Dist.] 1997, no writ)
(citing Moore, 722 S.W.2d at 686). (2) Nonetheless, the Texas Supreme Court clearly states
in Saenz, which predated Russell, that appellate courts must perform a meaningful review in
order to insure that the amount awarded is fair and reasonable. 925 S.W.2d at 614 ("And the
law requires appellate courts to conduct a meaningful evidentiary review of [mental anguish
awards]."). The Texas Constitution charges courts of appeals to review the factual
sufficiency of a jury's damages award. See Tex. Const. art. V, § 6; Tex. Gov't Code Ann.
§ 22.225(a) (Vernon Supp. 2006).

 There are reported Texas cases that affirm wrongful death awards for non-pecuniary
damages of up to $300,000 when the evidence showed a close relationship but did not show 
any significant interference in the wrongful death beneficiary's daily activities. For example,
the San Antonio Court of Appeals affirmed wrongful death awards of $300,000 to each of
two adult children as a result of their ninety-year-old mother's death caused by her fall in a
nursing home. See Living Ctrs. of Tex., Inc. v. Penalver, 217 S.W.3d 44, 55-57 (Tex.
App.-San Antonio 2006, pet. dism'd). The evidence recited in the opinion reflects that one
of the sons sought counseling for his grief, but the other did not. Id. at 56. The Penalver
Court recounts the testimony that showed a close relationship between the decedent and her
sons and concludes that the record shows "that both men suffered mental anguish over the
manner of their mother's negligently-caused death and it is also clear that her death left a
vacuum in this family." Id. Thus, it appears that the factual sufficiency of the large damage
awards in Penalver were not dependent upon testimony supporting a conclusion that each son
had suffered severe mental anguish or severe grief reaction from his mother's death. 
Nevertheless, the factual record of the relationships between the decedent and the wrongful
death beneficiaries appears to have been much more developed at the trial court level in
Penalver than occurred here. See id. at 55-57. Also, in Page v. Fulton, this Court upheld an
award of $150,000 to parents for the wrongful death of their adult daughter based on
evidence of their close family relationship with the decedent and on the mother's testimony
that she could hardly think about her daughter's death eight years after it occurred. Page v.
Fulton, 30 S.W.3d 61, 72-73 (Tex. App.-Beaumont 2000, no pet.).

 On the other hand, appellate courts frequently mention the trial testimony about a
wrongful death beneficiary's severe grief or severe mental anguish in support of a conclusion
that the evidence supporting a jury's damage award is factually sufficient. For example, in
Gulf States Utilities Company v. Reed, the Fourteenth Court of Appeals affirmed wrongful
death damages of $500,000 for loss of society and $500,000 in mental anguish awarded to
the mother of a thirteen-year-old boy who was electrocuted while retrieving a Frisbee from
under a metal building. Gulf States Utils. Co. v. Reed, 659 S.W.2d 849, 852-53 (Tex.
App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.). In reviewing the sufficiency of the
evidence, the Reed Court noted that the decedent was the mother's only child and that he had
a close affectionate relationship with her. Id. at 855. Further, the mother was hospitalized
for five months after his death. Id. Her doctors subsequently diagnosed her with severe
chronic depression attributable to her son's death and placed her on anti-depressants, which
were to be continued indefinitely. She also suffered severe weight loss and sleeping
difficulties following her son's death. Id.

 In General Chemical Corp. v. De La Lastra, two brothers died from asphyxiation
while working on a commercial fishing vessel. General Chem. Corp. v. De La Lastra, 815
S.W.2d 750, 753-54 (Tex. App.-Corpus Christi 1991), aff'd in part, rev'd in part on other
grounds, 852 S.W.2d 916 (Tex. 1993). The jury awarded the parents $10 million for loss of
companionship and mental anguish to compensate them for these elements of damage as a
result of the loss of their two sons. De La Lastra, 852 S.W.2d at 918-19 n.2. In explaining
why it affirmed the jury's wrongful death award, the Corpus Christi Court of Appeals noted
a psychologist's testimony that the parents would never get over the loss. De La Lastra, 815
S.W.2d at 761. The expert testified that the father was under psychiatric care to cope with
his grief, needed five to six years of treatment, and suffered from depression. Id. Further,
the psychologist testified that the mother, although she chose not to receive treatment was
"almost non-functional, very withdrawn, rarely leaves her home, and in fact did not attend
the trial of this case because of her grief." Id. (3)

 We also reviewed cases from the federal Fifth Circuit Court of Appeals reversing
wrongful death damage awards when the evidence showed only a loving relationship
between the decedent and the survivor. For example, in Transco Leasing Corp. v. United
States, the Fifth Circuit reversed and remanded awards of $500,000 each to two widows
whose husbands were airplane passengers killed in a mid-air plane collision. Transco
Leasing Corp. v. United States, 896 F.2d 1435, 1452-53 (5th Cir. 1990), amended on other
grounds on rehearing, 905 F.2d 61 (5th Cir. 1990). The Court noted that "these awards need
specific, cogent, and convincing reasons to justify them. It takes a very special, unique,
symbiotic relationship, the loss of which is likely to leave, after the ordinary time of grief,
an emptiness that results in long-lasting emotional devastation, to justify the maximum
amounts that we have approved in past cases for these types of losses." Id. at 1453. 
Although the damage awards in Transco were based upon Louisiana law, wrongful death
recoveries under Louisiana law "'include both the loss of the decedent's love and affection
and the grief and mental and physical anguish suffered by the survivor.'" Id. at 1451
(quoting Domangue v. Eastern Airlines, Inc., 542 F.Supp. 643 (E.D. La. 1982), rev'd in part
on other grounds, 722 F.2d 256 (5th Cir. 1984); citing Diefenderfer v. Louisiana Farm
Bureau Mutual Ins. Co., 383 So. 2d 1032 (La. App. 1980)). In Transco, the Fifth Circuit also
reduced an additional award to one widow for her loss of love and affection and for mental
anguish suffered because of the death of her five-year-old child in the same accident; the
Court reduced that award from $500,000 to $250,000. Id. at 1453.

 When the testimony demonstrates a severe depressive reaction lasting an unusually
long time, the Fifth Circuit has affirmed large non-pecuniary damage awards. In Gutierrez
v. Exxon Corp., the Fifth Circuit reviewed a jury award of $250,000 in loss of companionship
and $750,000 in mental anguish damages awarded to the parents of an oil-field service
worker. Gutierrez v. Exxon Corp., 764 F.2d 399, 401 (5th Cir. 1985). Noting that its
research disclosed this to be the highest published award in wrongful death damages for
surviving parents of an adult child, the Fifth Circuit refused to reverse because the amount
was "not disproportionate to at least one similar Texas case." Id. at 403 (citing Reed, 659
S.W.2d at 849). However, the Fifth Circuit noted that "Mr. and Mrs. Gutierrez were
suffering from a particularly severe depressive reaction that lasted an unusually long time."
Id.

 Further, in Wellborn v. Sears, Roebuck & Co., the Fifth Circuit affirmed an award of
$1,225,000 in mental anguish and loss of companionship damages to a minor's mother. 
Wellborn v. Sears, Roebuck & Co., 970 F.2d 1420, 1427 n.13 (5th Cir. 1992). The Fifth
Circuit noted:

 The evidence is sufficient to support the jury's award for Wellborn's loss of
companionship and society and for mental anguish. Since her divorce in 1979,
Wellborn had acted as Bobby's sole caretaker. Bobby and his mother had a
very close relationship and took part in many activities: the evidence indicates
that they fished, rode horses and shot firearms together. At trial, Wellborn
described Bobby as a thoughtful child and she introduced many cards and
letters Bobby had written to show his thoughtfulness. 

 The record establishes that Bobby's death had a profound impact on Wellborn.
Following Bobby's death, Wellborn initially missed some time from work, and
when she was at work she had a hard time. At first, she couldn't sleep at all,
and her doctor prescribed medication for her. The record also shows that
Wellborn attended group therapy sessions following Bobby's death. The
evidence also reveals that Wellborn was still affected by Bobby's death more
than two years after the accident. For example, at the time of trial, Wellborn
periodically missed time from work. Wellborn also keeps Bobby's room
virtually the same as it was before his death; and she visits Bobby's grave
almost daily and places paper flowers that she makes on his grave. 

Id. at 1429. Thus, in cases when a party challenges the factual sufficiency of large intangible
damage awards, Fifth Circuit opinions cite objective evidence demonstrating a severe grief
reaction in affirming such awards. See id.; Gutierrez, 764 F.2d at 403.


 On the other hand, when the damage awards to the wrongful death beneficiaries are
$200,000 or less, the Fifth Circuit has affirmed them without testimony of any evidence of
a significant disruption in the wrongful death beneficiary's daily activities. For example, in
Grandstaff v. City of Borger, the court affirmed an award of $200,000 to a father whose only
child was mistakenly killed by the police when the evidence showed their relationship was
a "close one." Grandstaff v. City of Borger, 767 F.2d 161, 165, 172 (5th Cir. 1985).

 Finally, while advocating in Bedgood v. Madalin that the judiciary should abandon
the pecuniary loss rule, Justice Spears suggested in his concurring opinion that evidence of
a severe grief reaction would be needed to support significant non-pecuniary damages:

 A plaintiff should be permitted to prove medically the damages resulting from
a tortfeasor's negligent infliction of emotional trauma.


 The damages recoverable, however, should be for actual mental injuries
rather than mere fear, anger, or sorrow. In most instances the normal grief
reaction will result in little or no actual mental injury, and the damages
suffered will be minimal or nonexistent. When the emotional trauma results
in depression or other secondary reactions, however, the plaintiff should
recover for the damages incurred. 


600 S.W.2d 773, 779 (Tex. 1980) (citations omitted).

 Later, in rejecting the pecuniary loss rule as a constraint on a parent's recovery of
mental anguish damages, the Texas Supreme Court affirmed a jury award of $102,500 for
mental anguish to the mother of a deceased fourteen-year-old killed in a motorcycle accident. 
Sanchez, 651 S.W.2d at 250, 253-54. The Sanchez evidence included testimony that the
child's mother suffered from traumatic depressive neurosis and had sought medical attention
for her neurosis which was accompanied by frequent neck and shoulder pain and headaches. 
Id. at 253.

 Thus, we conclude that the law requires appellate courts to conduct a meaningful
review of a jury's non-pecuniary damage award in a wrongful death case, which, in turn,
requires evidence "that the amount found is fair and reasonable compensation." Saenz, 925
S.W.2d at 614. While courts are to give due deference to the jury's verdict when the jury's
conclusions from the evidence submitted to it are reasonable, the courts are not required to
do so if the jury's conclusions are not justified by the evidence. City of Keller, 168 S.W.3d
at 812, 819-20. In this case, the jury did not have sufficient specific evidence to assess the
extent of Vivian's intangible damages arising from Shiketa's death. Without such evidence,
the jury could only speculate about the nature, duration, and severity of Vivian's mental
anguish and loss of companionship damages.

 Because Texas law applies no physical manifestation rule to restrict wrongful death
recoveries, a trial court in a death case is prudent when it chooses to submit the issues of
mental anguish and loss of society and companionship. While there is a presumption of
mental anguish for the wrongful death beneficiary, the Texas Supreme Court has not
indicated that reviewing courts should presume that the mental anguish is sufficient to
support a large award. In our view, testimony that proves the beneficiary suffered severe
mental anguish or severe grief should be a significant and sometimes determining factor in
a factual sufficiency analysis of large non-pecuniary damage awards.

 In summary, from the evidence presented, a rational trier of fact could have concluded
that Vivian and Shiketa had a normal mother-daughter relationship at the time of Shiketa's
death, and that they had lived happily together until Shiketa moved out of the home after
ninth grade. After that time, Shiketa lived independently. There is sparse testimony
specifying the effect of Shiketa's death on Vivian. The evidence in this case, consisting of
Vivian's testimony that she had a close and loving relationship with Shiketa and ate with her
regularly is insufficient to support the jury's large award of non-pecuniary damages. There
is insufficient evidence to establish Vivian had severe emotional trauma that resulted in a
lengthy depression or other severe secondary reaction. There is also insufficient testimony
to support the large damage award for Vivian's loss of Shiketa's love, comfort,
companionship, and society. Further, there is insufficient evidence supporting the conclusion
that Shiketa's death resulted in a serious and permanent interference with Vivian's daily
activities. Therefore, we agree with Dr. Hawkins's factual insufficiency arguments and hold
there is factually insufficient evidence to support the jury's award of $1 million in past and
future loss of society and companionship damages, or to support its award of $700,000 in
past and future mental anguish damages. Issue four, to the extent it challenges the factual
sufficiency of the jury's damage awards, is sustained.

V. Damage Award to Alex 


 Shiketa's father, Alex, complains that the jury's answers of "zero" on his damage
issues for past loss of companionship and society and for future mental anguish are against
the great weight and preponderance of the evidence. However, the jury awarded Strange
$3,500 for loss of companionship and society in the future, and $3,500 for past mental
anguish in the past. After applying the credit for Alex's settlement with Dr. Kastl, the trial
court's judgment awarded Alex no additional damages.

 On appeal, Dr. Hawkins requests that we affirm the trial court's judgment that Alex
take nothing. Thus, despite our sustaining Dr. Hawkins's issue on Vivian's claim that results
in awarding him a new trial, we are required to reach Alex's issues. See Pat Baker Co. v.
Wilson, 971 S.W.2d 447, 449 (Tex. 1998).

 A. Evidence Relevant to Alex's Damage Award

 The trial testimony reflects that for the majority of Shiketa's life, Alex was an
absentee father and did not provide for her financial support while she grew up. At age
twenty-four, according to Alex, Shiketa lived with him for twelve to eighteen months. Alex
learned about Shiketa's death on the day it occurred and went to her apartment but the police
would not let him in. Alex did attend Shiketa's funeral. With respect to their recent
relationship, Alex testified that he last saw Shiketa approximately two months before her
death and subsequently tried to help her get a job at the restaurant where he worked. When
asked whether he missed Shiketa, Alex responded: "I miss her a whole lot." Alex also
testified that Shiketa was the oldest of his seven children.

 Alex's entire testimony is contained in fourteen pages of the trial transcript. Other
than his and Vivian's testimony, which is also consistent with the jury's conclusion that he
had no substantial involvement with Shiketa, there is no other testimony relevant to his
damage claim. Dr. Hawkins argues that the damage award is sufficient given Alex's
testimony showing the absence of any close relationship between Alex and Shiketa. 

 B. Analysis of Factual Sufficiency of Jury's Damage Award to Alex

 In this case, Alex challenges the jury's findings that awarded him nothing on his
claims of past loss of companionship and future mental anguish. Initially, it appears
inconsistent for a jury to award damages in a death case for the wrongful death beneficiary's
past mental anguish but then award nothing for the beneficiary's future mental anguish. The
jury's damage award also appears inconsistent because it awarded Alex damages on future
loss of companionship but then awarded him nothing for his past loss of companionship. Our
review of the relevant testimony concerning Alex's damages reveals no evidence unique to
any one category of damages. Alex's evidence of damages for past and future mental
anguish and his evidence on past and future loss of society overlap. Further, Alex's evidence
on mental anguish and loss of companionship also overlap.

 With respect to the overlapping damage testimony, for example, Alex testified that
when he thinks about Shiketa, he mostly thinks of the mistakes he made. This testimony is
relevant to both past and future damages and also appears to be relevant to the jury's
consideration of Alex's loss of society and mental anguish. Alex testified that he attended
Shiketa's funeral but did not do "too good." This testimony appears relevant to Alex's
claims of past mental anguish and his past loss of companionship, as it tends to establish that
he had at least some emotional connection with Shiketa. Alex also testified that he missed
Shiketa "a whole lot." Alex's rather general testimony could have been related by the jury
to either his mental anguish or loss of society damage claims, and to both past and future
damages categories.

 In Golden Eagle Archery, Inc. v. Jackson, the Texas Supreme Court established how
courts of appeals are to conduct factual sufficiency reviews when "1) a jury is permitted to
award damages for elements that somewhat overlap, 2) the jury is instructed not to duplicate
an award for any particular loss, and 3) the jury awards no damages or damages that are
allegedly inadequate for an element that could overlap with another." Golden Eagle Archery,
Inc. v. Jackson, 116 S.W.3d 757, 759-60 (Tex. 2003). In this case, the trial court instructed
the jury not to include damages for one element in the others. Under Golden Eagle Archery,
we must presume that the jury followed these instructions and did not award damages for one
element more than once unless the record shows otherwise. Id. at 771. Thus, in determining
the damages proven by Alex, the jury charge "permitted the jury to make its own
determination of how to categorize and compensate" Alex based on his testimony about the
damages caused to him because of Shiketa's death. Id. at 770.

 In summary, the jury awarded no damages in two of the damage categories that could
have overlapped with the elements for which it awarded damages. If based on the evidence
before it, the jury could have compensated Alex for past loss of companionship when it
awarded him past mental anguish, "then the failure to award damages for that particular loss
would not be against the great weight and preponderance of the evidence." Id. at 771. The
same situation exists with respect to the jury's failure to award future mental anguish
damages when we consider that the jury could have compensated Alex for future mental
anguish based upon its award of future loss of companionship and society.

 We conclude that the jury's refusal to award Alex past loss of companionship and 
future mental anguish is a decision that involves overlapping damages. Therefore, the jury's 
apparently inconsistent award is one that was within the jury's province. Given the
testimony, or lack thereof, to establish that Alex had a close relationship with Shiketa, the
jury's total damage award of $7,000 for the intangible losses Alex suffered is not so against
the great weight and preponderance of the evidence that it is manifestly unjust, nor does the
award shock our conscience or clearly demonstrate bias. The jury's award appears to be
rationally based on the testimony on the relationship Alex had with Shiketa. This resolution
of Alex's issue gave "due regard to a jury's choice of whether and how to categorize and
compensate for specific losses or injuries that could reasonably fall into more than one
category of damages[,]" and is not against the great weight and preponderance of the
evidence. Id. at 775. As a result, we find no error in the trial court's decision to refuse
Alex's request for a new trial, which was based upon the apparent inconsistency of the
damage awards. Alex's two issues are overruled, and the trial court's judgment as to Alex's
claims is affirmed.

VI. Other Issues Raised on Appeal by Dr. Hawkins


 We do not reach Dr. Hawkins's remaining issues. In issue one, Dr. Hawkins
complains that the trial court included a spoliation instruction in its jury charge, and
complains in issue five that during closing argument Vivian's attorney improperly alluded
to Dr. Hawkins's insurance coverage. In issues two and three, Dr. Hawkins complains that
the evidence is factually insufficient to support the jury's finding of negligence and
proximate cause. Because these remaining issues would only entitle Dr. Hawkins to receive
a new trial, which is the relief we have granted with respect to issue four, we need not reach
them. See Tex. R. App. P. 47.1.

 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.




 ____________________________

 HOLLIS HORTON

 Justice




Submitted on March 8, 2007

Opinion Delivered October 4, 2007

Before McKeithen, C.J., Kreger and Horton, JJ.

DISSENTING OPINION


 Because the majority reverses the jury's determination of non-economic damages
suffered by Vivian Walker for the death of her child, Shiketa Walker, and remands same to
the trial court for a new trial, I respectfully dissent to Section IV of the majority opinion and
would affirm the damage awards. While I agree with the majority that appellate courts are
to conduct a meaningful evidentiary review in order to insure that the amount awarded is fair
and reasonable, under a factual sufficiency review, appellate courts review all of the evidence
to determine if it is so weak, or the contrary evidence so overwhelming, as to render the
finding clearly wrong or manifestly unjust. See Missouri Pac. R. Co. v. Roberson, 25 S.W.3d
251, 257 (Tex. App.--Beaumont 2000, no pet.). The mere fact that an award is large does
not show that the jury was influenced by passion, prejudice, sympathy, or other
circumstances not in evidence, and the award must be flagrantly outrageous, extravagant, and
so excessive that it shocks the judicial conscience before an appellate court sets it aside lest
we run afoul of the Texas Constitution's guarantee of a right to trial by jury. Id.; see also
Tex. Const. art. I, § 15. Because the jury awarded future mental anguish damages in an
amount less than one-half of the amount awarded for mental anguish damages suffered in the
past, it clearly shows that the jury did not ". . . simply pick a number and put it in the blank." 
Saenz v. Fidelity & Guar. Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996). To the jury
is consigned under the constitution the ultimate power to weigh the evidence and determine
the facts - and the amount of damages in a particular case is an ultimate fact. The jury's role
in determining non-economic damages is perhaps even more essential and should not be
disturbed on appeal unless such award is flagrantly outrageous, extravagant, and so excessive
that it shocks the judicial conscience as to be clearly wrongfully influenced by passion,
prejudice, sympathy or other circumstances not in evidence. 


 _____________________________

 CHARLES KREGER 

 Justice


Dissent Delivered

October 4, 2007

1. Prior to trial, MHBH and Dr. Hawkins elected a dollar-for-dollar settlement credit. 
The trial court's calculation of the amount of the damages awarded to Vivian and Alex,
which includes court costs and prejudgment interest, appears to have been based upon the
proportionate responsibility statute applicable on the date that Vivian's suit was filed, and
no party challenges the court's calculation of the settlement credits. See Act of May 8, 1995,
74th Leg., R.S., ch. 136 § 1, 1995 Tex. Gen. Laws 971, 973 (current version Tex. Civ. Prac.
& Rem. Code Ann. §§ 33.012-.013) (Vernon Supp. 2006). 
2. But, the issue the Supreme Court decided in Moore was whether a trial court that
refused to submit mental anguish and loss of companionship and society issues erred by
doing so; the Texas Supreme Court was not engaged in the process of reviewing the factual
sufficiency of evidence supporting the award. See Moore, 722 S.W.2d at 684.
3. Additional cases that address the sufficiency of evidence in death claims are: (1)
Pittsburgh Corning Corp. v. Walters, 1 S.W.3d 759, 781 (Tex. App.-Corpus Christi 1999,
pet. denied) (upholding award of $145,438 to each parent for the death of their adult-son, an
only child upon whom they depended for substantial support, with the record containing 
specific details about the pain, suffering, and mental anguish of each plaintiff); (2) Guzman
v. Guajardo, 761 S.W.2d 506, 508, 511-12 (Tex. App.-Corpus Christi 1988, writ denied)
(upholding award of $800,000 for loss of society and mental anguish to mother for the death
of her seven-year-old son, with supporting psychiatric testimony that the mother exhibited
signs of paranoia, hysteria, and severe anger due to the son's death, and upholding $160,000
award to father with psychiatric testimony that the father had a very good relationship with
the son); (3) Missouri Pac. R.R. Co. v. Lane, 720 S.W.2d 830, 832-33 (Tex. App.- Texarkana
1986, no writ) (upholding an award of $327,000 in mental anguish and lost companionship
to the parents of a child apparently old enough to drive, and noting that the record reflected
the death was "especially difficult" on the child's parents); and (4) Brownsville Med. Ctr. v.
Gracia, 704 S.W.2d 68, 70, 80 (Tex. App.-Corpus Christi 1985, writ ref'd n.r.e.) (upholding
an award of $500,000 to the parents of a nine-year-old child and stating that the record
contained "sufficient proof of physical manifestation of appellees' mental pain and anguish
to support the jury's finding. . . .").